# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
August 31, 2011 Session[1]

## LEONARD EDWARD SMITH v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Hamblen County**
**No. 99CR310      O. Duane Slone, Judge**

---

**No. E2007-00719-SC-R11-PD - Filed December 19, 2011**

---

In this post-conviction appeal Petitioner Leonard Edward Smith challenges his 1985 conviction and life sentence for the first degree felony murder of John Pierce, his 1989 conviction for the first degree felony murder of Novella Webb, and his 1995 death sentence for the Webb murder. We affirm Smith's conviction and sentence for the Pierce murder, holding that Smith's post-conviction claims in the Pierce case were barred by the statute of limitations and that the statute should not be equitably tolled. We affirm Smith's conviction for the Webb murder, holding that Smith did not demonstrate that he suffered prejudice resulting from his counsel's ineffective assistance in failing to adequately question the potential jurors during voir dire at his 1989 trial in the Webb case regarding their past experiences either as a victim or with a victim of crime. We vacate Smith's death sentence, holding that Smith's counsel provided ineffective assistance in failing to adequately investigate and present evidence supporting his motion to recuse the judge at his resentencing hearing, which resulted in a denial of Smith's due process right to a fair trial before an impartial tribunal. We further hold that Smith is entitled to a new hearing on the question of whether he was intellectually disabled at the time of the Webb murder because the post-conviction court and the Court of Criminal Appeals applied an incorrect legal standard in determining Smith's functional intelligence quotient (I.Q.) under the principles recently espoused in Coleman v. State, 341 S.W.3d 221, 230 (Tenn. 2011).

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal**
**Appeals Affirmed in Part and Vacated in Part;**
**Case Remanded to Post-Conviction Court**

---

[1] Oral argument in this case was heard at the Duncan School of Law, Lincoln Memorial University, in Knoxville, Tennessee.

SHARON G. LEE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Gordon W. Smith, Associate Solicitor General; John H. Bledsoe, Senior Counsel; H. Greeley Wells, Jr., District Attorney General, Barry P. Staubus, Deputy District Attorney, for the Appellant, State of Tennessee.

Paul J. Morrow, Jr., Deputy Post-Conviction Defender, and Kelly A. Gleason, Assistant Post-Conviction Defender, Nashville, Tennessee, for the Appellee, Leonard Edward Smith.

**OPINION**

**I**.

This case has a long procedural history that includes multiple prior appeals and rulings by this Court and the Court of Criminal Appeals. In 1999, this Court provided the following background:

> In 1984 the defendant, Leonard Edward Smith, his friend, David Hartsock, and his girlfriend, Angela O'Quinn, robbed two small grocery stores in rural Sullivan County. Armed with a .32 caliber pistol, Hartsock entered Malone's Grocery alone, while Smith and O'Quinn waited for him outside the store in Smith's car. During the course of the robbery, Hartsock shot and killed John Pierce. The trio left Malone's Grocery and proceeded to [Novella] Webb's store near the Carter–Sullivan County line. Both Smith and Hartsock entered Webb's store. Smith was carrying the gun, and during the robbery, he shot and killed Novella Webb. The victim and her husband owned and operated the store.

> [Smith] was charged with two counts of first degree murder for the killings of Pierce and Webb. The offenses were joined for trial, and, at Smith's request, venue for the trial was changed from Sullivan to Hamblen County. Smith was convicted on both counts of first degree felony murder. At the conclusion of the proof, the State withdrew its notice of intent to seek the death penalty with respect to the Pierce murder, and the trial court imposed a life sentence. However, the jury imposed a sentence of death for the Webb murder. On his first direct appeal, this Court affirmed Smith's conviction and life sentence for the killing of Pierce, but reversed Smith's conviction of first degree murder and sentence of death for the Webb murder. Concluding that the offenses should not have been joined for trial and also finding

-2-

prosecutorial misconduct during final argument, this Court reversed and remanded the case for a new trial. State v. Smith, 755 S.W.2d 757 (Tenn. 1988) ("Smith I").

Smith was re-tried and again convicted of first degree felony murder and sentenced to death for the Webb killing. On the second direct appeal, this Court affirmed the conviction, but again vacated the death sentence, finding that the jury had been improperly allowed to consider the life sentence imposed for the Pierce murder in considering whether or not Smith should be sentenced to death for the Webb murder, and that the felony supporting the conviction of first degree murder had been improperly used to establish the felony murder aggravating circumstance in violation of State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992). The case was remanded to the trial court for a third sentencing hearing. See State v. Smith, 857 S.W.2d 1 (Tenn. 1993) ("Smith II").

State v. Smith, 993 S.W.2d 6, 9 (Tenn. 1999) ("Smith IV") (footnote omitted).

Judge Edgar P. Calhoun, Jr. presided over Smith's first two trials. Before the third trial, he retired, and the case was assigned to Judge Lynn W. Brown. After being assigned the case, Judge Brown *sua sponte* changed the venue from Hamblen to Johnson County and also denied a defense motion to recuse himself on the ground that he had been the prosecuting attorney in an earlier case in which Smith was convicted of robbery and driving under the influence ("DUI"). In a Tenn. R. App. P. 10 appeal, the Court of Criminal Appeals held that the trial court erred by changing venue without the defendant's consent and that under the facts as then developed and presented in the record, Judge Brown did not err in refusing to recuse himself. State v. Smith, 906 S.W.2d 6, 10, 11-12 (Tenn. Crim. App. 1995) ("Smith III"). Regarding the recusal issue, the Smith III court further stated that

this issue may be more fully litigated in a direct appeal. If the record is adequately developed so as to establish that the nature of the trial judge's participation in the earlier prosecution deprived the defendant of a fair and impartial arbiter in this case, relief in the way of a new sentencing hearing may be available. This opinion does not foreclose that possibility.

Id. at 12.

At the third sentencing hearing, the State "introduced very little proof regarding the circumstances of the offense." Smith IV, 993 S.W.2d at 9. The State waived opening

statement and introduced the following proof in support of the sole aggravating circumstance[2] relied upon by the State to support a death sentence:

> The State's proof consisted of copies of indictments and judgments reflecting that the defendant had been convicted of robbery in Carter County on October 13, 1980, and on February 21, 1985, and that the defendant had been convicted of first degree murder for the killing of John Pierce on March 20, 1985. The reference to the life sentence imposed for the Pierce murder conviction had been redacted from the copy of the judgment passed to the jury. The State also introduced the judgment which established that the defendant had been convicted of the first degree murder of the victim in this case on August 23, 1989. With respect to each of these convictions, the State offered identification testimony to establish that Leonard Edward Smith is the same person who was previously convicted of the robbery and murder offenses.

Id. at 10. The State also introduced victim impact testimony from Mrs. Webb's daughter, and then rested its case-in-chief.

The defense called Sullivan County Sheriff Keith Carr, who was the detective in charge of investigating the Webb murder in 1984. Shortly after Smith's arrest, Smith had provided then-Detective Carr a statement recounting his involvement in the Pierce and Webb murders. At the defense's request, Sheriff Carr read the entire statement to the resentencing jury, which provided as follows:

> I, Leonard Edward Smith, am giving this statement of my own free will and without any threats or promises being made to me. On Monday, May 21, 1984, I was with my girlfriend Angie O'Quinn and David Hartsock, and, we went and got some liquor and went to a road near the Sullivan–Carter County line. We parked and were just drinking and talking and smoked some joints. While we were on that road in my black Ford Pinto which I had painted black because it used to be orange, David said "Get out, I want to talk to you." He and I got out and walked a ways from the car where Angie couldn't hear us talking and David said, "I can get us a little bit of money here at this

___

[2] The single aggravating circumstance upon which the State relied to support imposition of the death penalty provided as follows at the time of the offense: "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, which involve the use or threat of violence to the person." Tenn. Code Ann. § 39–2–203(i)(2) (Supp. 1982). The statutory aggravating circumstance currently provides: "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2) (2010).

store." He said, "It's the store down at the county line." I asked him if it was Shorty Malone's and he said, "Yes." Angie and I drove David down there, and let him off a little ways from the store. I parked on a little paved road beside the store. David had a .32 caliber chrome-plated pistol with him. The pistol was his pistol. I heard several shots fired and just a few seconds later David came running around the store. David jumped into the car and said, "Get the hell out of here, I had to shoot him." I figured it was Shorty because he ran the store. We drove out the road that goes beside of Malone's Grocery and it dead ends and you can turn left to the Wautauga area, or right back to Sullivan County. We turned onto the Wautauga Highway and drove to what is known as Mountain Road. I asked David if he shot the man, and he said, he shot him one time and the man pulled a gun and started shooting at him. I don't remember if he said what money he got. I drunk some more liquor, and made Angie get out of the car. I started drinking and was just going to drive us out of the mountain. We came out at some store, and I turned left and, drove until I realized I was going to [sic] wrong way, and I pulled it in at Webb's Store to turn. I stopped the car at Webb's and David jumped out, and I ran in the store behind him. David ran and jumped on the counter, and knocked the old man over and yelled to me to, "get that bitch" referring to an old woman at the end of the counter. I started towards her, and she started throwing things at me and started spraying paint on me. I fired one shot just to scare people, but, the old woman just kept spraying orange paint and came towards me. I couldn't see because of the paint and I held the gun up and apparently the old lady was trying to get the gun away from me and it went off. We ran from the store when I fired the second shot. I didn't really know that I had shot her until we heard it later on the news. When we were in Webb's Store the old man was hollering, "help me, help me," and hollering for his wife. The old woman never did say anything that I remember. I know that before we left the store, some man came up to the door, and I told him to get out of there. I didn't get any money from either store, and David didn't say if he did or not. David and I left Webb's and went back up towards Mountain Road, and picked Angie up. I told her we had to get out of there, and we drove down towards Underwood Park, and set the car on fire. David cut a hose next to the carburetor and set the car on fire. David, Angie and me took off on the trails, and really didn't know which way to go. We came out at a house on Indian Creek. It was the Johnson residence because my dad had sold them the house. We didn't go to the house until late last night, and Angie got Gladys Sheets to take us to the home where we were arrested this morning. I had never been to the house before but had been in the area. When Gladys drove us to Dennis Cove, she said she thought we did it. I had taken my shirt and

wrapped my feet so I could walk and I think I left it in Gladys' car or at the house. Gladys had told us that Mrs. Webb, and the man at Malone's were both dead. We told Gladys that we didn't do it and she said, "If you didn't, you better keep the gun because the news said it was a .38," and she knew we had a .32 caliber. I told David to throw the gun out anyway because I knew we had done it. He threw it out as we went over a bridge, and we drove on up to the house. We stopped at a grocery store, and Angie and Gladys went in and got some food for us to take to the house. We fixed something to eat, and went to sleep, but, I felt like they knew where we were at. I had cut mine and David's hair with a pair of scissors Angie had in her pocketbook because I knew they would be looking for somebody with longer hair. This morning I heard a loud noise, and I knew we were caught then. I told Angie, "I'm going out, and you come out too, so we won't get hurt." Somebody had yelled for us to come out, and David went out first. All I know is that everything didn't turn out the way it was supposed to, and it shouldn't have happened. I am sorry for what happened, because I know I am a thief, but, I don't think of myself as a murderer. This is all I know to tell you about what happened.

Id. at 10-12.

After Sheriff Carr testified, Smith abruptly and unexpectedly told his attorneys that he wanted to waive the presentation of further mitigation proof, offer no final argument, and rest his case. The circumstances surrounding Smith's waiver of mitigation evidence, and Judge Brown's decision allowing him to waive evidence of mitigating factors and final argument, were as follows:

After Smith stated, "I'm ready to rest," during a jury-out hearing, one of Smith's attorneys advised the trial court that Smith had instructed him earlier that morning to waive mitigation. Defense counsel advised Smith against waiving mitigation, but Smith continued to insist upon that course of action. When the trial court asked if any expert psychological proof raised question about Smith's competency, defense counsel responded, "not anything that would justify any claim that he was incompetent I don't feel like. If I'd felt like that before today obviously I would have made it known to the court."

At that point the trial court accurately stated the law as follows:

Well, this is a bit of a difficult situation. In general, an attorney must represent a client, and the rule is that the client determines what is in his interest and what he wants done, and then the

lawyer has an obligation to, first of all, advise the client regarding alternatives; but, after giving proper and thorough advice, to follow the wishes of the client. Is that not correct, Gentlemen?

To the trial court's inquiry, Smith's attorneys responded, "Yes, sir" and "Yes, Your Honor." Before making a final decision on this issue, the trial court allowed defense counsel a twenty minute recess to confer privately with Smith regarding his desire to waive mitigation. When the hearing reconvened, defense counsel reported that they had informed Smith that they were prepared to present mitigation proof, had advised him of the benefits of presenting the proof, and had warned him of the harm which could result if the proof was not presented. Despite this advice, Smith had remained insistent that they "rest the case and waive argument."

At this point, the trial court attempted to question Smith to ensure that he understood his rights and the potential consequences of his decision. Because the trial court had admonished Smith earlier in the trial to speak only through his attorneys and to refrain from speaking aloud during the testimony of other witnesses, Smith refused to be sworn and would not respond to the trial court's inquiries except through his attorneys. Smith advised his attorney to inform the trial court that he wanted to rest his case and waive argument. At that point, the trial court advised Smith as follows:

if you cease putting on mitigating evidence and you instruct your counsel to not argue and they do both, they don't put on any other proof, and they do not argue in your benefit, in the court's opinion this jury will almost certainly return with a verdict of death by electrocution. And, I guess I've only seen perhaps twelve or thirteen death penalty cases tried and most of them did not result in a death penalty verdict. But, from those that I have seen in five or six death penalty verdicts, actually about half; but if your attorneys follow your instructions that will be the very likely result. Do you understand that, sir?

Smith, through his attorney, answered "Yes" to the trial court's question.

The trial court further questioned defense counsel about the defendant's competence. On the first occasion, counsel stated, "Of course, I've known Leonard now for ten or eleven years. He's always been competent, at least, in my opinion." After commenting that the defendant's attorneys had each practiced law for twenty years, the trial court inquired once again, "And, you have no personal doubts as to his competency and legal ability to make such a decision I take it?" Neither attorney expressed any doubt about Smith's

competence to waive mitigation. Before recalling the jury, the trial court commented that he had observed Smith confer with counsel and actively participate in the case and once again advised Smith of his right to present mitigation and of the likely consequences of the waiver. Smith adhered to his decision to waive mitigation and argument. When the jury was recalled, the defense rested.

Id. at 14-15.

The jury returned a sentence of death. Judge Brown approved the sentence as thirteenth juror and entered the judgment. Smith was represented by attorneys Larry Weddington and J. Robert Boatwright in the Webb murder case from 1984 through 1999. After the 1995 resentencing hearing and while the direct appeal was pending, Smith's counsel filed a motion to remand the case for a determination of Smith's competence to waive mitigation and whether Smith was intellectually disabled as defined by statute and therefore ineligible for the death penalty. See Tenn. Code Ann. § 39-13-203 (2010). The motion to remand stated as follows in pertinent part:

> Because of counsel and court error, insufficient inquiry was made regarding [Smith's] competency to waive presentation of mitigating evidence at his capital resentencing hearing.
>
> . . . .
>
> Counsel erred by failing to first consult with their experts, Dr. Schacht and Dr. Smith, before advising the court that there was no issue regarding [Smith's] competency to decide to waive mitigation. Counsel acknowledge that they should, at least, have provided the trial court with copies of the reports submitted by their experts . . . in order to assist the court in determining whether there was an issue regarding [Smith's] competency.
>
> . . . .
>
> Counsel failed to appreciate the significance of the findings from their experts' evaluations of [Smith] with respect to the issue of competency. Recently, upon learning that [Smith] desired to waive his appeals and volunteer for execution, counsel had occasion to re-examine the question of his competency at the time of the sentencing hearing and inquired of their experts whether they had an opinion regarding [Smith's] competency. Counsel were surprised to discover that both experts seriously questioned whether

[Smith] was competent to make the decision to waive presentation of mitigating evidence.

. . . .

Counsel failed in their basic duty to advocate on behalf of their client by permitting him to waive mitigation and closing argument, particularly by allowing him to do so without a thorough exploration of his competency to make that decision.

Attached to the motion to remand were affidavits from Boatright, Weddington, and mental health experts Dr. Thomas Schacht and Dr. Murray Smith, who had previously examined and evaluated Smith. Dr. Schacht's affidavit states as follows:

My psychological evaluation of Mr. Smith revealed him to be an extremely impulsive person with markedly impaired cognitive and emotional functioning. . . . The record and my own evaluation confirm that Mr. Smith suffers neurological deficits consistent with brain damage. Of particular relevance for the court is that, on tests which measure ability to attend and concentrate, his scores are comparable to those produced by individuals who are in the lower ranges of the mentally retarded. This impairment is especially relevant to the question of whether he possesses adequate capacity to appreciate the ongoing events of a court proceeding and assist his attorneys in that regard.

In view of the foregoing, I believe that there was a serious question regarding whether Mr. Smith was competent to make the decision to waive presentation of mitigating evidence at his sentencing hearing. In my opinion, his mental impairments were such that further inquiry regarding his competency should have been made at the time of trial. I base this opinion on the results obtained from my pretrial evaluation of Mr. Smith, the symptoms of paranoia and depression manifested by Mr. Smith prior to trial, and the fact that the practical demands as well as the psychological stress of a trial situation would be expected to exacerbate such symptoms. Although I was on-call and prepared to testify, I was not informed of Mr. Smith's decision to waive presentation of mitigating evidence until after the proceedings had concluded. Had I been asked by the Court or the attorneys, I would have been willing to immediately and contemporaneously evaluate Mr. Smith for the purpose of providing evidence related to mental capacities underlying competency to make the decision to forego proof at his sentencing hearing.

I am willing now to conduct an evaluation of Mr. Smith's competency-related capacities at the time of trial. Although a retrospective determination of competency is more difficult to make than a contemporaneous determination, I am not aware of any conditions which would make it impossible to undertake such an evaluation at this point in time.

[Numbering in original omitted].

Dr. Murray Smith's affidavit states:

At the request of his attorneys, I interviewed Leonard Edward Smith and reviewed numerous documents pertaining to his background and history. My evaluation revealed Mr. Smith to be mentally retarded as a result of brain damage resulting from childhood medical trauma and chronic abuse of alcohol and inhalants.

During my interview with him, Mr. Smith exhibited extremely paranoid beliefs, based in part on his limited cognitive abilities and in part on emotional disturbance resulting from continuing episodes of violence throughout his childhood. Mr. Smith is also very impulsive, and when frightened or angry, he reacts in an irrational manner. His perception that the victim's family was conspiring with the prosecution and local law enforcement to deny him a fair trial could easily have produced such a reaction during the proceedings.

Although I was present in court that day, I was not consulted by Mr. Smith's attorneys prior to their allowing him to make the decision to rest his case and waive argument. I have since been contacted by them, and expressed the opinion that Mr. Smith's competency to make such a decision was questionable. Given his paranoia, impulsivity, and limited mental abilities, I have serious doubts that Mr. Smith was in fact competent to rationally assist in his own defense at that point in time.

[Numbering in original omitted].

Weddington filed his affidavit concluding that "I should have made further inquiry into [Smith's] mental state at the time of his decision to waive presentation of mitigating evidence." Boatwright testified in his affidavit as follows:

[Smith's] decision to waive presenting further mitigation evidence after calling only one witness, and to rest his case and offer no final argument, came as a

-10-

complete surprise to me. In some ways, he talked and acted like the same person that I had been representing for approximately twelve (12) years, but, in hindsight, he was reacting quite differently to the pressures of trial and the courtroom setting than he had in his two (2) previous trials. Upon reflection and a review of Mr. Smith's behavior over the entire period of time that I have represented him, I now have a real question about his mental ability to have competently made the decision that might very well cost him his life.

Both attorneys testified at the post-conviction hearing that at the time of the resentencing hearing when Smith decided to waive presentation of mitigation proof, they believed that he was competent to make that decision and they had no indication, from expert testimony or otherwise, that he was incompetent.

The motion to remand was denied, and the case proceeded on appeal without the above-referenced affidavits in the appellate record. This Court ruled that the trial court did not err by allowing Smith to waive mitigation evidence, and affirmed his death sentence. Smith IV, 993 S.W.2d at 16, 22.

Following Smith IV, on December 17, 1999, Smith filed a *pro se* post-conviction petition asserting various challenges to his conviction and death sentence for the Webb murder. The post-conviction court appointed new counsel for Smith, entered an order concluding that the petition stated a colorable claim, and directed appointed counsel to file an amended post-conviction petition. The amended petition, filed on May 10, 2001, challenged Smith's convictions and sentences for both the Webb and Pierce murders. The amended petition admitted that Smith's conviction and sentence for the Pierce murder became final in 1988, but argued that the statute of limitations should be equitably tolled. As a basis for the tolling, Smith alleged that he had been represented by attorneys Weddington and Boatright from the time of his original trial in 1985 through the conclusion of the direct appeal of his sentencing in 1999, and their performance had not been reviewed for ineffectiveness. Smith did not obtain new counsel until he filed his post-conviction petition, and he argued that therefore this was his first opportunity to challenge the effectiveness of his previous counsel's representation. Additional amendments to the petition were filed on January 10, 2002, and November 20, 2002. In the last amendment to the petition, post-conviction counsel alleged that Smith was mentally retarded and therefore constitutionally ineligible for the death penalty.

The post-conviction court bifurcated the mental retardation claim from the remaining claims and conducted a hearing on April 1–2, 2004. By order entered May 21, 2004, the post-conviction court denied Smith's mental retardation claim and reserved ruling on the remaining claims. By subsequent order, the post-conviction court clarified its order and

affirmed its prior ruling that Smith had failed to present sufficient proof in support of the mental retardation claim.

The post-conviction court heard the remaining claims on March 28–29, 2006, and December 4, 2006. At the last hearing, Smith's counsel, over the objection of the State, was allowed to amend his petition to allege that he received ineffective assistance of counsel based on their failure to adequately investigate the facts concerning Judge's Brown's denial of the recusal motion and a due process claim based on Judge Brown's failure to recuse himself. See Smith v. State, No. E2007-00719-CCA-R3-PD, 2010 WL 3638033, at *7 (Tenn. Crim. App. Sept. 21, 2010).

The post-conviction court denied relief to Smith on any of his post-conviction claims. The Court of Criminal Appeals affirmed the denial of relief on the claims challenging Smith's conviction and life sentence for the Pierce murder, and affirmed his conviction for the Webb murder. The court vacated the death sentence after determining that Smith had received ineffective assistance of counsel based on their failure to investigate and present the facts necessary to support the motion to recuse Judge Brown. The court noted that counsel had failed to review the district attorney general's file from the 1985 robbery conviction, which would have revealed the communications between then-prosecutor Brown and the prosecutor of the murder charges against Smith. The Court of Criminal Appeals held this to be deficient performance that resulted in prejudice to Smith. Smith v. State, 2010 WL 3638033, at *45.

Both the State and Smith applied for permission to appeal. We granted both applications for permission to appeal, and address the following issues:

(1) whether Smith was denied his right to a fair trial at his 1995 resentencing hearing when his counsel failed to investigate and present evidence in support of his motion to recuse the sentencing judge;

(2) whether Smith's counsel provided him ineffective assistance in failing to adequately question the potential jurors during voir dire at his 1989 trial in the Webb case regarding their past experiences either as a victim or with a victim of crime;

(3) whether Smith is entitled to a new hearing on the question of whether he was intellectually disabled at the time of the Webb murder; and

(4) whether Smith's post-conviction claims in the Pierce case were barred by the statute of limitations and if so, whether the statute should be equitably tolled.

## II.

Smith, as the petitioner for post-conviction relief, has the burden of proving his factual allegations by clear and convincing evidence. Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011) (citing Tenn. Code Ann. § 40-30-110(f) (2006) and Tenn. Sup. Ct. R. 28 § 8(D)(1)). The factual findings of the post-conviction court are binding on an appellate court unless the evidence in the record preponderates against those findings. Dellinger v. State, 279 S.W.3d 282, 294 (Tenn. 2009). The post-conviction court's application of law to its factual findings is reviewed de novo with no presumption of correctness. Calvert, 342 S.W.3d at 485. A claim of ineffective assistance of counsel presents a mixed question of law and fact that is subject to de novo review with no presumption of correctness. Id.; Dellinger, 279 S.W.3d at 294; Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008).

Underlying our review is the fundamental constitutional principle that a person is entitled to a fair trial. U.S. Const. amend XIV, § 1 (providing that no State shall "deprive any person of life, liberty, or property, without due process of law"). To protect this right, a person who is accused of a crime is entitled to representation by counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). This right is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006); see U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."); Tenn. Const. art. I, § 9 ("[I]n all criminal prosecutions, the accused hath the right to be heard by himself and his counsel."). Inherent in the constitutional right to counsel is the right to effective assistance of counsel. Strickland, 466 U.S. at 686; Dellinger, 279 S.W.3d at 293 (citing Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)); Pylant, 263 S.W.3d at 868. The Supreme Court advised in Strickland that, "[i]n giving meaning to the requirement" of effective assistance, "we must take its purpose—to ensure a fair trial—as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 446 U.S. at 686. Given the seriousness of a death sentence, "[c]ourts are particularly cautious in preserving a defendant's right to counsel at a capital sentencing hearing." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (internal quotation marks omitted); see also Cooper v. State, 847 S.W.2d 521, 532 (Tenn. Crim. App. 1992)).

When a petitioner challenges a death sentence, the issue is whether, considering the totality of the circumstances and the proof presented at the sentencing hearing, "there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance

of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. The Strickland Court further stated that

> in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, *the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged*.

Id. at 696 (emphasis added).

Thus, in this case, we must ultimately focus on "the fundamental fairness of the proceeding" under the particular circumstances presented here. Id. In Lockhart v. Fretwell, 506 U.S. 364 (1993), the Supreme Court, "apply[ing] the case-by-case prejudice inquiry that has always been built into the Strickland test," id. at 370 n.2, reiterated that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." Id. at 369.

To assist in this analysis, in Strickland, the United States Supreme Court adopted a two-part analysis for ineffective assistance of counsel claims. 466 U.S. at 687; Calvert, 342 S.W.3d at 486. Under Strickland, the first inquiry focuses on counsel's performance – whether "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688; Padilla v. Kentucky, ___ U.S. ___, 130 S. Ct. 1473, 1482 (2010). Counsel is required to "perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations." Pylant, 263 S.W.3d at 868 (quoting Baxter v. Rose, 523 S.W.2d 930, 934-35 (Tenn. 1975)). The second Strickland inquiry is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; see Calvert, 342 S.W.3d at 486.

### III.

Smith challenges the fundamental fairness of his 1995 resentencing hearing based on Judge Brown's history of prosecuting Smith on other charges at the same time that he was on trial for the Webb murder, and Judge Brown's communication, correspondence, and cooperation as a prosecutor with the prosecuting attorney in the Webb case. Smith argues that his lawyers failed to effectively represent him when they did not adequately investigate and present facts supporting the motion for Judge Brown to recuse himself in the resentencing hearing. Smith asserts that he was deprived of his right to a fair trial before an

impartial tribunal when Judge Brown did not recuse himself, the judicial process was injured by the appearance of impropriety and unfair lack of impartiality on the part of a judge sentencing him to death, and there was structural constitutional error when Judge Brown allowed Smith to waive presentation of mitigating evidence to the resentencing jury, approved the death penalty as thirteenth juror, and entered a death sentence.

Judge Brown's role as a prosecuting attorney and then as a judge were closely intertwined with Smith's murder cases. Judge Brown first became involved with Smith in May of 1984. Smith was indicted in Carter County for simple robbery and DUI and prosecutor Brown, then an assistant district attorney general in Carter County, was assigned to prosecute Smith. On August 24, 1984, Smith was indicted in Sullivan County for the May 21, 1984 murder of Novella Webb. See Smith I, 755 S.W.2d at 759. District Attorney General H. Greeley Wells, Jr., who was then an assistant district attorney general in Sullivan County, was assigned to prosecute Smith on the murder charges in the Webb and Pierce cases.

On January 30, 1985, before the trials in Carter County or Sullivan County were conducted, prosecutor Brown noted in the district attorney general's file in the Smith case: "Called Greeley Wells, Sullivan DA office. He says the judge will not let them introduce any conviction from Carter in sentencing in Sullivan. No poss. offer of concurrent time in Sullivan Co." In another file note, prosecutor Brown states that on February 15, 1985, he "Called Wells. Requested copy of def's statements in Sullivan Co." The same day, prosecutor Wells drafted and sent a letter to prosecutor Brown stating: "Dear Lynn: Please find enclosed a handwritten and typed copy of Smith's statement relating to the two robbery-murders he is presently charged with in Sullivan County. Good luck, H. Greeley Wells, Jr. P.S. Let me know the results of your trial."

Prosecutor Brown obtained simple robbery and DUI convictions on February 21, 1985. He sought sentencing of Smith as a persistent offender based upon his 1980 convictions for robbery and third degree burglary. A handwritten note by prosecutor Brown at the bottom of the February 15, 1985 letter he received from Wells states: "Called Greeley – told Greeley of conviction. They try him on March 18." Prosecutor Brown sent prosecutor Wells a letter on March 11, 1985, stating: "Dear Greeley: Enclosed you will find certified copies of the indictment against Leonard Smith for robbery and also a copy of the minute entry of conviction as you requested. Please let me know if you need any additional information. Best of luck with the trial." Prosecutor Wells introduced the February 21, 1985 robbery conviction obtained by prosecutor Brown into evidence at the sentencing trial of Smith in 1985, and again at the re-sentencing trial in September of 1995. This conviction was used as an aggravating factor supporting a death penalty under Tennessee Code Annotated section 39-2-203(i)(2).

On April 8, 1985, Smith was sentenced in the Carter County case to fifteen years for robbery and eleven months, twenty-nine days for the driving offense. At the sentencing hearing, prosecutor Brown attempted to elicit testimony from the probation officer who prepared the presentence report that Smith had been convicted of two counts of first degree murder in Sullivan County for the Webb and Pierce homicides, and that the murders had been committed during the course of armed robberies. The Carter County trial court sustained a defense objection to this testimony, and also denied prosecutor Brown's request to have Smith's sentences in the Carter County case run consecutively to the sentences imposed for the Sullivan County murders. In arguing for consecutive sentencing, prosecutor Brown stated that his request was based on the fact that "there's not been a death penalty actually carried out in this State." The Carter County convictions were affirmed by the Court of Criminal Appeals. Following the direct appeal, Smith filed a post-conviction petition to which prosecutor Brown prepared and filed an answer denying that Smith was entitled to relief.

In 1989, Smith was indicted for introducing or attempting to introduce contraband into the Carter County jail. Judge Brown, who by then had become a First District Criminal Court judge, presided over the contraband case less than one year after he had been actively defending Smith's convictions that he had obtained as a prosecutor in the Carter County robbery/DUI case. Judge Brown denied Smith's motion for recusal. When Smith was found guilty, Judge Brown sentenced him as a persistent offender based in part on the convictions Judge Brown had obtained as a prosecutor. Judge Brown sentenced Smith to the maximum permissible term – ten years – to be served consecutively to "all other cases including his two convictions for Murder I in Hamblen County (transferred from Sullivan County)." Smith moved for a new trial, renewing his claim that Judge Brown committed prejudicial error by failing to recuse himself "after having served as a prosecutor of the Defendant in several prior criminal cases resulting in convictions while a member of the District Attorney General's office, some of said convictions [having been] considered by the Court as aggravating circumstances in the sentencing of [the] Defendant in the present case." Judge Brown denied the motion for new trial. On appeal, the Court of Criminal Appeals reversed Smith's conviction for introducing contraband into the jail on grounds of prosecutorial misconduct and did not reach the recusal issue. State v. Smith, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990).

In 1995, Judge Brown then presided over Smith's resentencing hearing in the Webb murder case. The sole aggravating circumstance the State relied upon to support imposition of the death penalty was that Smith had been "previously convicted of one (1) or more felonies . . . which involve the use or threat of violence to another person." Tenn. Code Ann. § 39-2-203(i)(2) (Supp. 1982) (currently Tenn. Code Ann. § 39-13-204(i)(2) (2010)). One of the convictions used by the State to establish this aggravating factor was the February 21,

1985 robbery conviction obtained by prosecutor Brown. Judge Brown ruled that Smith could waive presentation of mitigation evidence and final argument, approved the death penalty as thirteenth juror, and entered judgment sentencing Smith to death. The sentence was affirmed on appeal, and Smith filed a post-conviction petition. The trial court denied relief.

Smith did not receive effective assistance of counsel based on his lawyers' failure to investigate and present the readily available evidence supporting his motion to recuse Judge Brown. The State does not take issue with this holding. The critical issue is whether Smith was prejudiced by the ineffectiveness of his counsel.

Our review is guided by Strickland's directive that our "ultimate focus of inquiry must be on the fundamental fairness of the proceeding." 466 U.S. at 696. The Strickland Court stated that the two-part ineffective assistance of counsel test was not to be applied mechanically. Id. Rather, we are required to look at the unique facts of each case and, using the considerations set forth in Strickland, decide the ultimate issue of fairness. We must focus on whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

The principles underpinning judicial recusal rules have long been recognized by this Court as being of fundamental importance to the administration of justice and the judicial system. Well over a century ago, this Court observed the importance of both the appearance and perception of an impartial judiciary, stating:

> The Constitution of this State provides that no judge of the Supreme or inferior courts shall preside on the trial of any cause in the event of which he may be interested . . . Art. 5, s. 11. This provision is certainly broad enough to fortify the integrity of the courts against suspicion; for the mere blemish of suspicion is, to the judicial ermine, a blot of defilement. . . . [I]t is a familiar remark of Sir William Blackstone that the administration of justice should not only be chaste but unsuspected.
>
> . . . .
>
> [N]o judge should preside in a cause, or render any judgment, or make any order, where he can by possibility be suspected of being warped by the influence of fear, favor, partiality, or affection. When once a court has lost the charm of integrity and justice, with which it should ever be invested, it forfeits its influence for good, and degrades the majesty of the law.
>
> . . . .

It is [the judge's] exalted province to pronounce upon the rights of life, liberty, and property, to make the law respected and amiable in the sight of the people, to dignify that department of the government upon which, more than all others depend the peace, the happiness, and the security of the people. But when once this great office becomes corrupted, when its judgments come to reflect the passions or the interest of the magistrate rather than the mandates of the law, the courts have ceased to be the conservators of the common weal, and the law itself is debauched into a prostrate and nerveless mockery.

Harrison v. Wisdom, 54 Tenn. (7 Heisk.) 99, 110, 111, 112 (1872); see also Neely v. State, 63 Tenn. (4 Baxt.) 174, 182-83 (1874). In the case of In re Cameron, the Court, in determining that a judge who had made remarks indicating he had already decided a case before hearing it was disqualified, stated that "[t]he fundamental principle is that parties litigant are entitled to an impartial judge. It is only when the people are satisfied that impartial judges decide their controversies that they entertain feelings of reverence for the judgments of the courts of the land." 151 S.W. 64, 76 (Tenn. 1912). The Court reasoned that

it is of immense importance, not only that justice shall be administered to [the people], but that they shall have no sound reason for supposing that it is not administered. It is of lasting importance that the body of the public should have confidence in the fairness and uprightness of the judges created to serve as dispensers of justice.

Id.

More recently, we have observed that "'[i]f the public is to maintain confidence in the judiciary, it is required that cases be tried by unprejudiced and unbiased judges.'" State v. Rimmer, 250 S.W.3d 12, 37 app. (Tenn. 2008) (quoting Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994)); see also State v. Reid, 213 S.W.3d 792, 815 (Tenn. 2006) ("'[T]he preservation of the public's confidence in judicial neutrality requires not only that the judge be impartial in fact, but also that the judge be perceived to be impartial.'") (quoting Kinard v. Kinard, 986 S.W.2d 220, 228 (Tenn. Ct. App.1998)); Bd. of Prof'l Responsibility v. Slavin, 145 S.W.3d 538, 548 (Tenn. 2004); Davis v. Liberty Mut. Ins. Co., 38 S.W.3d 560, 564 (Tenn. 2001) ("If the public is to maintain confidence in the judiciary, cases must be tried by unprejudiced and unbiased judges."); State v. Lynn, 924 S.W.2d 892, 898 (Tenn. 1996) ("It is the appearance that often undermines or resurrects faith in the system. To promote public confidence in the fairness of the system and to preserve the system's integrity in the eyes of the litigants and the public, 'justice must satisfy the appearance of justice.'") (quoting Offutt v. United States, 348 U.S. 11, 13 (1954)); Leighton v. Henderson, 414

S.W.2d 419, 421 (Tenn. 1967) ("The purpose of Article 6, § 11 of our Constitution is to insure every litigant the cold neutrality of an impartial court.").

Recusal is required when a judge has previously served as prosecutor of a defendant in the same case. Wilson v. State, 281 S.W. 151, 151 (Tenn. 1926); Mathis v. State, 50 Tenn. (3 Heisk.) 127, 127 (1871). Recusal is not required when a judge presides over a proceeding where the defendant is found to be a habitual criminal based on the defendant's earlier indictments, guilty pleas, and convictions at a time when the judge was then District Attorney General. State v. Warner, 649 S.W.2d 580, 582 (Tenn. 1983). Because habitual criminal conviction is a status, not a crime, there is no showing of "prejudice or improper influence upon the jury . . . from the name of the trial judge appearing" as the prosecutor on the prior convictions. Id. Recusal has been held not to be required when nothing more was shown than that the trial judge had previously prosecuted a defendant on an unrelated case. See State v. Conway, 77 S.W.3d 213, 224-25 (Tenn. Crim. App. 2001) (judge who previously prosecuted defendant for DUI not required to recuse himself in subsequent DUI case); Owens v. State, 13 S.W.3d 742, 757 (Tenn. Crim. App. 1999) (where post-conviction judge was "*one of nearly seventy attorneys* employed by the District Attorney's Office" at time of trial and "knew nothing about the facts of this case," recusal not required) (emphasis in original); Moultrie v. State, 584 S.W.2d 217, 219 (Tenn. Crim. App. 1978) (where "the trial judge had at some time in the past been an assistant attorney general who had issued a subpoena in an unrelated trial of petitioner," recusal not required).

A judge should grant a motion to recuse "when the judge has any doubt as to his or her ability to preside impartially in the case or when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Bean v. Bailey, 280 S.W.3d 798, 805 (Tenn. 2009) (quoting Davis, 38 S.W.3d at 564-65) (internal quotation marks omitted); see also Alley, 882 S.W.2d at 820. Article VI, section 11 of the Tennessee Constitution provides that "[n]o Judge of the Supreme or Inferior Courts shall preside on the trial of any cause in the event of which he may be interested . . . ." We have observed that "[t]his provision is intended 'to guard against the prejudgment of the rights of litigants and to avoid situations in which the litigants might have cause to conclude that the court had reached a prejudged conclusion because of interest, partiality, or favor.'" Bean, 280 S.W.3d at 803 (quoting State v. Austin, 87 S.W.3d 447, 470 (Tenn. 2002)); see also Chumbley v. People's Bank & Trust Co., 57 S.W.2d 787, 788 (Tenn. 1933). Tennessee Code Annotated section 17-2-101 similarly provides that "[n]o judge or chancellor shall be competent, except by consent of all parties, to sit in the following cases: (1) Where the judge or chancellor is interested in the event of any cause."

Furthermore, Tennessee Supreme Court Rule 10, Canon 3(E)(1) provides that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding." The decision whether to grant a motion for recusal is discretionary with the trial judge. Bean, 280 S.W.3d at 805. However, the standard is objective; even if a judge subjectively believes he or she can be fair and impartial, the judge should disqualify himself or herself upon request whenever "the judge's impartiality might be reasonably questioned because the appearance of bias is as injurious to the integrity of the judicial system as actual bias." Id. (quoting Davis, 38 S.W.3d at 565) (internal quotation marks omitted).

Applying these principles to the case before us, it is apparent that the roles of prosecutor Brown and Judge Brown were too closely connected. Prosecutor Brown was actively involved in prosecuting Smith on separate criminal charges *at the same time* that Smith was being prosecuted and tried for the Sullivan County murders of Pierce and Webb. Prosecutor Brown was in regular communication with prosecutor Wells regarding the Sullivan County cases. Prosecutor Brown requested and was provided with a copy of an important piece of evidence in the Pierce and Webb murder cases – Smith's statement to law enforcement given shortly after his arrest regarding his involvement in the Pierce and Webb murders. Judge Brown, in his previous role as prosecutor, had been in possession of critical evidence introduced in Smith's murder case. Smith's robbery conviction that prosecutor Brown obtained was later used as an aggravating circumstance in the sentencing hearing over which Judge Brown presided, resulting in the imposition of the death penalty. Under the set of particular facts presented in this case, we find that a person of ordinary prudence would have a reasonable basis for questioning Judge Brown's impartiality.

It is a basic tenet of our jurisprudence that "'[t]he right to a fair trial before an impartial tribunal is a fundamental constitutional right.'" Bean, 280 S.W.3d at 803 (quoting Austin, 87 S.W.3d at 470). "The principles of impartiality, disinterestedness and fairness are fundamental concepts in our jurisprudence." Rimmer, 250 S.W.3d at 37 app. (quoting State v. Bondurant, 4 S.W.3d 662, 668 (Tenn. 1999)) (internal quotation marks omitted); Davis, 38 S.W.3d at 564 ("'[I]t goes without saying that a trial before a biased or prejudiced fact finder is a denial of due process.'") (quoting Wilson v. Wilson, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998)); Kinard, 986 S.W.2d at 228 ("[O]ne of the central tenets of our jurisprudence is that all litigants have a right to have their cases heard by fair and impartial judges."). In State v. Benson, 973 S.W.2d 202, 205 (Tenn. 1998), we observed that there is "a due process right under the federal constitution to a fair trial before an impartial judge," and stated that

[M]ost questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard. Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar. But the floor established by the Due Process Clause clearly requires a "fair trial in a fair tribunal," before a judge with no actual bias against the defendant or interest in the outcome of his particular case.

Id. at 205-06 (citations omitted) (quoting Bracy v. Gramley, 520 U.S. 899, 904-05 (1997). The Benson Court then turned to the issue of "whether the denial of the right to a fair trial before an impartial judge is subject to harmless error analysis," 973 S.W.2d at 207, and stated that "the right to an impartial judge is one of the rights that are so basic to a fair trial that their infraction has never been treated as harmless." Id. (citing State v. Bobo, 814 S.W.2d 353, 357 (Tenn. 1991)). The Court concluded that "[t]he denial of the petitioner's right to an impartial judge is a constitutional error which affects the integrity of the judicial process. A new trial is the only remedy." Id.

Moreover, Tennessee courts have on several occasions recognized the denial of the right to an impartial tribunal as a structural constitutional error – one that "compromise[s] the integrity of the judicial process itself" and therefore is "not amenable to harmless error review, and . . . require[s] automatic reversal." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). In Momon v. State, 18 S.W.3d 152, 165-66 (Tenn. 1999), this Court observed that

[d]espite the strong interests that support application of the harmless error doctrine, the United States Supreme Court and this Court have consistently held that some errors defy harmless error analysis and require reversal. . . . Only a very limited class of errors have been found to be "structural," and subject to automatic reversal. See . . . Tumey v. Ohio, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927) (adjudication by a biased judge); . . . State v. Benson, 973 S.W.2d 202, 207 (Tenn.1998) (denial of right to impartial judge)

. . . .

Unlike such defects as a complete deprivation of counsel or trial before a biased judge, denial of the defendant's right to testify does not in all cases render a criminal trial fundamentally unfair or call into question the reliability of the trial as a vehicle for determining guilt or innocence.

(Citations omitted); see also Bobo, 814 S.W.2d at 357 (citing the right to an impartial judge as among the "constitutional rights that are so basic to a fair trial that their infraction has never been treated as harmless"); State v. Bowman, 327 S.W.3d 69, 91 (Tenn. Crim. App. 2009) (same); Steadman v. State, 806 S.W.2d 780, 784 (Tenn. Crim. App. 1990) (noting that "[i]n essence, the presence of a statutory or constitutional provision that a judge is incompetent in a given proceeding is a declaration that, as a matter of policy, the appearance of fairness in the justice system is as important as actual fairness to our society" and concluding harmless error analysis inapplicable to situation involving incompetent post-conviction judge).

As the Momon Court recognized, the United States Supreme Court has reached a similar conclusion. In Strickland, the Court stated that "[i]n giving meaning to the [effective assistance of counsel] requirement, however, we must take its purpose – to ensure a fair trial – as the guide." 466 U.S. at 686. The Court provided this definition: "a fair trial is one in which evidence subject to adversarial testing is presented *to an impartial tribunal* for resolution of issues defined in advance of the proceeding." Id. at 685 (emphasis added). In In re Murchison, 349 U.S. 133 (1955), the Court, considering the due process requirement of a "fair and impartial trial," id. at 135, stated:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end . . . no [one] is permitted to try cases where he [or she] has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. . . . Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice."

Id. at 136 (quoting Offutt, 348 U.S. at 14). Three decades later, the Court observed:

> When constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm. Accordingly, when the trial judge is discovered to have had some basis for rendering a biased judgment, his actual motivations are hidden from review, and we must presume that the process was impaired. See Tumey v. Ohio, 273 U.S. 510, 535, 47 S.Ct. 437, 445, 71 L.Ed. 749 (1927) (reversal required when judge has

financial interest in conviction, despite lack of indication that bias influenced decisions).

Vasquez v. Hillery, 474 U.S. 254, 263 (1986); see also Sullivan v. Louisiana, 508 U.S. 275, 279 (1993) (recognizing "trial by a biased judge" as among constitutional errors not amenable to harmless error analysis); Gomez v. United States, 490 U.S. 858, 876 (1989) ("Among those basic fair trial rights that '"can never be treated as harmless"' is a defendant's 'right to an impartial adjudicator, be it judge or jury.'") (quoting Gray v. Mississippi, 481 U.S. 648, 668 (1987)); Rose v. Clark, 478 U.S. 570, 577-78 (1986) ("[S]ome errors necessarily render a trial fundamentally unfair. . . . Harmless-error analysis thus presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury."); Tumey, 273 U.S. at 532 ("Every procedure which . . . might lead [a judge] not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.").

The United States Supreme Court has made it clear that the inquiries regarding whether judicial recusal is required and whether Strickland prejudice has been established are done on a "case-by-case" basis, examining the facts and circumstances presented in each particular case. Lockhart, 506 U.S. at 369, n.2. In its most recent case addressing judicial recusal, Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009),the United States Supreme Court reiterated that the applicable standard is an objective one that "consider[s] the specific circumstances presented by the case." Id., 556 U.S. at ___, 129 S. Ct. 2252, 2262. The Court explained that "th[is] Court has identified additional instances which, as an objective matter, require recusal. These are circumstances 'in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" Id., 129 S. Ct. at 2259 (quoting Withrow v. Larkin, 421 U.S. 35, 47 (1975)). Reviewing its earlier recusal cases and citing Murchison for the proposition that "the disqualifying criteria 'cannot be defined with precision. Circumstances and relationships must be considered,'" id. at 2261, the Court further stated:

> The inquiry is an objective one. The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is "likely" to be neutral, or whether there is an unconstitutional "potential for bias."
>
> . . . .
>
> The difficulties of inquiring into actual bias, and the fact that the inquiry is often a private one, simply underscore the need for objective rules. Otherwise there may be no adequate protection against a judge who

simply misreads or misapprehends the real motives at work in deciding the case. The judge's own inquiry into actual bias, then, is not one that the law can easily superintend or review, though actual bias, if disclosed, no doubt would be grounds for appropriate relief. In lieu of exclusive reliance on that personal inquiry, or on appellate review of the judge's determination respecting actual bias, the Due Process Clause has been implemented by objective standards that do not require proof of actual bias. In defining these standards the Court has asked whether, "under a realistic appraisal of psychological tendencies and human weakness," the interest "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented."

Id. at 2262, 2263 (citations omitted) (quoting Withrow, 421 U.S. at 47); see also Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 864 (1988) (vacating final judgment under Fed. R. Civ. P. 60(b) due to appearance of impropriety because judge's impartiality could reasonably be questioned under the circumstances).

There is no evidence of actual bias on Judge Brown's part, nor does the record provide reason to question his subjective determination that he should not be required to recuse himself for lack of impartiality. But because bias and impartiality exist in the mind, and often only subconsciously, this will nearly always be the case in a recusal inquiry. As Caperton holds, due process does not require a showing of actual, subjective bias or lack of impartiality, which as a practical matter may be impossible to prove. Id. at 2262. Over twenty years ago this Court made the following apt and pertinent observations in addressing a motion to recuse in a case involving capital punishment:

Rare is the person, layman or judge, who will admit bias or lack of impartiality in performing a duty or responsibility, before or after the fact. Equally rare are those whose personal sensibilities are not injured by an allegation of bias and lack of impartiality. . . . But a trial judge about to begin a trial in which a defendant's life is at stake . . . should be certain that neither actual bias nor the appearance of bias against defense counsel exists before denying the motion [to recuse]. Nothing less satisfies the fair administration of criminal justice.

State v. Green, 783 S.W.2d 548, 553 (Tenn. 1990).

After reviewing the facts in this case and applying Strickland and its progeny, we hold that under the particular facts of this case, Smith was denied the right to a fair trial because of counsel's errors. The failure of Smith's counsel to adequately investigate and support the motion for recusal of Judge Brown resulted in prejudice to Smith; he was denied his right to

a fair trial before an impartial tribunal. The justice meted out in this case did not " satisfy the appearance of justice." Offutt, 348 U.S. at 13. The potential injury to the judicial process due to the appearance of impropriety and unfair lack of impartiality by a judge imposing a death sentence is too great to allow the sentence of death to stand. In this case, the circumstances already discussed above – Judge Brown's former role as a prosecutor of Smith on other criminal charges at the same time as his trial for murder, multiple and regular instances of communication between prosecutors Brown and Wells regarding Smith's criminal cases, and his acquisition of Smith's statement regarding his involvement in the Webb and Pierce murders – compel a conclusion that Strickland prejudice has been established by, among other things, operation of the denial of due process and the specter of potential unfairness in this case.

We reach this conclusion mindful of the fact that Judge Brown was subsequently called upon to approve a verdict and enter judgment sentencing Smith to death. We have on numerous occasions recognized "the heightened due process applicable in capital cases" and "the heightened reliability required and the gravity of the ultimate penalty in capital cases." State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994); see also Pike v. State, 164 S.W.3d 257, 266 (Tenn. 2005) ("[W]e must be mindful that 'a sentence of death is final, irrevocable, and "qualitatively different" than any other form or level of punishment.'") (quoting Van Tran v. State, 66 S.W.3d 790, 809 (Tenn. 2001)); State v. Terry, 813 S.W.2d 420, 425 (Tenn. 1991) ("Now it is settled law that the penalty of death is qualitatively different from any other sentence, and that *this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed*") (emphasis in original)(internal quotation marks and citations omitted); Cooper, 847 S.W.2d at 531 (reversing death penalty on ineffective assistance grounds; noting "the Supreme Court 'has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination'") (quoting California v. Ramos, 463 U.S. 992, 998–99 (1983)).

**IV.**

Smith claims that his trial counsel were ineffective in failing to adequately question the potential jurors during voir dire at his 1989 trial in the Webb case concerning their past experiences either as a victim or with a victim of crime. He asserts that this deficiency resulted in the seating of a juror, Morris Bagwell, whose daughter's boyfriend had been murdered in the year preceding the trial in this case. He argues that the juror's bias must be presumed and that prejudice to the outcome of his trial must also be presumed. Smith asserts the proper remedy is a retrial of the Webb case. The State's position is that the performance by Smith's counsel was not deficient and there was not a showing of prejudice.

The record from the 1989 trial reflects that the attorneys originally tendered to the trial court a proposed written juror questionnaire that contained specific questions relating to the prospective jurors' experiences with crime. The trial court did not, however, include those particular questions in the final version of the juror questionnaire that was submitted to the prospective jurors. The transcript of the oral voir dire reflects that no one – neither the trial court nor the attorneys – asked the prospective jurors whether they or someone close to them had ever been the victim of a crime.

At the post-conviction hearing, only Weddington, Boatright, and Juror Bagwell testified on this point. Weddington conceded that a trial lawyer would want to know whether a juror or someone close to that juror was the victim of a crime. He testified that there was no strategy behind not asking that question, leaving the impression that it was simply an oversight. Boatright also acknowledged the importance of asking jurors about whether they or someone close to them had been the victim of a crime. He likewise testified there was no tactical or strategic reason not to ask those questions.

Juror Bagwell testified at the post-conviction hearing that he was a minister by trade. Shortly before Smith's trial in 1989, Juror Bagwell's daughter's boyfriend, Charlie Minor, was murdered. His daughter was on the telephone with Minor immediately before the murder. Juror Bagwell testified that he liked Minor and was pleased with the relationship between Minor and his daughter. After Minor's death, he went with Minor's parents when they first saw the body after the murder. Juror Bagwell was aware that the perpetrator ultimately pleaded guilty to first-degree murder and was sentenced to life imprisonment. He testified that the impact of Minor's death on his own family had been great. No one asked him during voir dire whether he or someone close to him had been the victim of a crime. Although he did not voluntarily disclose the information concerning Minor's murder, he testified that he would have disclosed it had he been asked.[3] He did not know whether any of the other jurors knew about his experience with Minor's murder.[4]

---

[3] Juror Bagwell also testified that despite his experiences with the murder of Minor, he gave Smith a fair trial and based his verdict solely on the evidence he heard at trial. The Court of Criminal Appeals declined to consider this testimony regarding what effect Minor's death may have had on Juror Bagwell's verdict. The court held, and we agree, that unless there is evidence of an extraneous or improper influence on the jury, testimony concerning the jury's internal deliberative process is improper. See Walsh v. State, 166 S.W.3d 641, 649 (Tenn. 2005) (holding that it is error to consider a juror's testimony regarding the effect internal information had on the decision-making process); see also Tenn. R. Evid. 606(b) (limiting post-verdict juror testimony to *extraneous* prejudicial influences on a juror's verdict).

[4] Smith introduced memoranda purportedly prepared by the post-conviction investigator concerning post-trial interviews of the 1989 trial jurors. The trial court accepted these not as exhibits, but as offers of proof. According to Smith, these memoranda indicate that several of the jurors were exposed to the

(continued...)

-26-

Both the United States and the Tennessee Constitutions guarantee a criminal defendant the right to a trial by an impartial jury. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "The ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial." State v. Hugueley, 185 S.W.3d 356, app. 390 (Tenn. 2006) (citing State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994), and State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993)). The "proper fields of inquiry include the juror's occupation, habits, acquaintanceships, associations and other factors, including his [or her] experiences, which will indicate his [or her] freedom from bias." State v. Onidas, 635 S.W.2d 516, 517 (Tenn. 1982) (quoting Smith v. State, 327 S.W.2d 308, 318 (Tenn. 1959)). While there is no requirement that counsel ask any specific questions of potential jurors during the voir dire process, this Court has previously recognized that potential bias arises if a juror has been involved in a crime or incident similar to the one on trial. See Ricketts v. Carter, 918 S.W.2d 419, 422 (Tenn. 1996); Durham v. State, 188 S.W.2d 555, 558 (Tenn. 1945). We believe that questions to cull the jury for persons who might be biased due to their past experiences with the criminal justice system are a critical part of a competent voir dire in criminal cases, and that, absent a showing that counsel had a strategic reason for not asking the question, the failure to ask the prospective jurors about their past experiences as victims or associates of victims is objectively unreasonable. See Hughes v. United States, 258 F.3d 453, 460 (6th Cir. 2001) (stating that "'[a]bsent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel'") (quoting Johnson v. Armontrout, 961 F.2d 748, 755 (8th Cir. 1992)).

We conclude that the failure of counsel to question the jury venire about their experiences as crime victims or relating to crime victims was deficient performance under the circumstances of this case. Despite this deficiency, however, we conclude that Smith has failed to prove prejudice. In order to prevail on a claim of ineffective assistance of counsel based on deficient voir dire, a petitioner is required to prove that the deficiency resulted in having a juror seated who was actually biased. See Dellinger v. State, No. E2005-01485-CCA-R3-PD, 2007 WL 2428049, at *30 (Tenn. Crim. App. Aug. 28, 2007), aff'd, 279 S.W.3d 282 (Tenn. 2009); see also State v. Caughron, 855 S.W.2d 526, 539 (Tenn. 1993) (stating in the context of a direct appeal challenge to juror bias that "[w]here a juror is not legally disqualified or there is no inherent prejudice, the burden is on the Defendant to show

---

[4](...continued)
information concerning Juror Bagwell's experience with the murder of his daughter's friend. Again, this information concerning the jury's deliberative process is inadmissible. See Walsh, 166 S.W.3d at 649. Furthermore, we note that the evidentiary value of these summaries was weak – although the investigator testified, she never confirmed that the summaries were prepared by her from interviews she conducted with the 1989 jurors.

that a juror is in some way biased or prejudiced"); State v. Baker, 956 S.W.2d 8, 16 (Tenn. Crim. App. 1997) (same).

Smith argues that bias should be presumed. Whether a juror's partiality may be presumed from the circumstances is a question of law. Cf. Durham, 188 S.W.2d at 559; State v. Akins, 867 S.W.2d 350, 355-56 (Tenn. Crim. App. 1993). In Tennessee, a presumption of juror bias arises "'[w]hen a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality . . . .'" Carruthers v. State, 145 S.W.3d 85, 95 (Tenn. Crim. App. 2003) (citing Akins, 867 S.W.2d at 355). Likewise, "[s]ilence on the juror's part when asked a question reasonably calculated to produce an answer is tantamount to a negative answer." Akins, 867 S.W.3d at 355. Therefore, a juror's "failure to disclose information in the face of a material question reasonably calculated to produce the answer or false disclosures give rise to a presumption of bias and partiality." Id. at 356 (footnotes omitted). Other circumstances justifying a presumption of bias include a juror's willful concealment of prior involvement as the prosecuting witness in a similar case or a juror's concealment of a close personal or familial relationship with one of the parties involved in the trial. See Hugueley, 185 S.W.3d at 378 (citing Durham, 188 S.W.2d at 559, and Toombs v. State, 270 S.W.2d 649, 651 (Tenn. 1954)). This case is distinguishable from those cases because Juror Bagwell was never asked the question and did not willfully conceal his history. Compare State v. Pender, 687 S.W.2d 714, 718 (Tenn. Crim. App. 1984) (stating that there was no inherent prejudice in jury service by a reserve police officer where neither party asked whether any juror worked in law enforcement). See also Miller v. Webb, 385 F.3d 666, 674 (6th Cir. 2004) (stating that to prevail on a claim of ineffective assistance of counsel based on trial counsel's failure to strike a biased juror, the petitioner must show that the juror was actually biased). We have never presumed bias absent either an affirmative statement of bias, willful concealment of bias, or failure to disclose information that would call into question the juror's bias, and we decline to do so now.

Accordingly, to prevail on this claim, Smith is required to prove actual bias. He has introduced no evidence of actual bias or partiality. To the contrary, Juror Bagwell testified that he recalled telling the trial judge in response to questioning that there was no reason he could not give Smith a fair trial. Accordingly, Smith was not prejudiced by counsel's failure to ask the 1989 prospective jurors whether they or anyone close to them had ever been the victim of a crime.

## V.

The next issue we address is whether Smith's mental capacity meets the statutory definition for "intellectual disability" pursuant to Tennessee Code Annotated section 39-13-203(a). The United States Supreme Court has "concluded that imposing the death penalty

on persons with intellectual disability[5] is 'excessive' and, therefore, that the United States Constitution '"places a substantive restriction on the State's power to take the life" of a mentally retarded offender.'" Coleman, 341 S.W.3d at 234 (quoting Atkins v. Virginia, 536 U.S. 304, 321(2002)).  Similarly, in Van Tran v. State, this Court "determined that imposing the death penalty on persons who were intellectually disabled at the time of the offense violated the prohibition against cruel and unusual punishment in Article I, Section 16 of the Tennessee Constitution."  Coleman, 341 S.W.3d at 236; see Van Tran v. State, 66 S.W.3d 790, 812 (Tenn. 2001).

In Coleman, we examined at length "the process and criteria used by the courts to determine whether a criminal defendant charged with first degree murder should not be subject to the death penalty because he or she was a person with intellectual disability when the murder was committed."  Coleman, 341 S.W.3d at 230.  We observed the following regarding the Tennessee statute defining "intellectual disability":

> Other than a recent 2010 amendment to replace the term "mental retardation" with "intellectual disability," the statutory criteria for finding that a person is intellectually disabled have remained unchanged since 1990.  Thus, for the purpose of determining whether a person was intellectually disabled at the time he or she committed first degree murder, the term "intellectual disability" now means:
>
> > (1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;
> > (2) Deficits in adaptive behavior; and
> > (3) The intellectual disability must have been manifested during the developmental period, or by eighteen (18) years of age.

Coleman, 341 S.W.3d at 233 (quoting Tenn. Code Ann. § 39–13–203(a)).

---

[5] As we observed in Coleman v. State, 341 S.W.3d 221 (Tenn. 2011),

> The terms "intellectual disability" and "mental retardation" refer to the same population in number, kind, type, and duration of disability.  Thus, the terms are interchangeable, Tenn. Code Ann. § 33–1–101(16)(C) (Supp. 2010), and "intellectual disability" is the preferred term.

Id. at 226 n.5 (internal citations omitted).

The record from the post-conviction hearing examining Smith's history of intellectual functioning and adaptive behavior established the following. Leonard Edward Smith was born on December 30, 1960, to Ora Belle and Leroy Smith. The Smith family lived in extreme poverty. When Smith was very small, they lived in a renovated bus, then moved to a three-room house without running water and electricity. The house, where Smith shared a room and bed with his two brothers, was kept in a dirty and unsanitary condition. Smith's mother had finished the seventh grade in school but could not read or write, and was "mentally limited" to the point where she was never able to learn how to operate a sewing machine.

Smith's father, Leroy, only had a third grade education and was also illiterate. Leroy, a severe alcoholic who remained drunk most of the time, was violent and abusive when he was drinking. Smith's mother reported that his father would threaten the family members with knives, guns, and chainsaws. Leroy would frequently fire off guns in the house, shooting holes in the floor, when he was intoxicated. On one occasion, he held Smith and his mother at knifepoint in a bedroom for several hours. Smith's mother said that Leroy would hit his children "too hard" and that she would try to stop him. When Smith was eight or nine years old, his father enlisted Smith to drive him around the community while his father was drunk.

When Smith was three years old, on September 2, 1964, a lawn mower operated by his father threw a nail that was projected into Smith's stomach. He was admitted to the hospital that day, but doctors were unable to determine immediately what had happened. The next day, Smith was in serious condition; his abdomen was extended, his pulse rapid, and he was vomiting dark green fluid. Surgery revealed that his stomach had been perforated in three places. On September 4, 1964, Smith's temperature reached 107.2, and he suffered a seizure. His condition remained critical for several days; his mother stated that he was "covered up" several times, and she was told that he was dead. On September 11, 1964, Smith passed a rusty half-inch piece of a nail through his urethra. He was discharged from the hospital nine days later.

From the beginning, Smith had problems and difficulties in school. He failed and repeated the second grade twice. Smith's fifth-grade teacher recommended that he repeat the fifth grade, but he was socially promoted to seventh grade instead. At that time, no special education services were available in Carter County. At school, other children picked on Smith because of his small physical size and ill-fitting and often dirty clothing, which had been mostly provided by charitable organizations. Elizabeth Ann Sanders, the Director of Assessment, Information and Research for the State of Tennessee Department of Education in the Division of Special Education, reviewed Smith's school records and testified that

There are so many red flags in those records. The first thing that hit me over the head was the fact that Mr. Smith was retained in second grade three times, which is just, in my opinion, unconscionable. Teachers, school systems should have been referring a student, who is failing to make progress, the first year that that student was seen to be falling back behind the rest of the classmates.

Ms. Sanders observed that in Smith's case, there was "no evidence of anything remedial" done for him by the school system. Linda McDowell, a retired special education specialist who taught at Smith's elementary school beginning shortly after he left, reviewed his records and also observed "a lot of red flags in the records, the medical history, the educational history where the test scores were very inconsistent, the problems with attendance, all of those things would have been a red flag for evaluation." Ms. McDowell concluded that "it's evident that he basically fell through the cracks of [the school system] and was not provided the services that he needed."

When he was seven years old, Smith took the California Reading Test and scored in the fourth percentile, with a total reading score in the seventh percentile. When he was eight, his reading scores were in the first percentile, meaning that approximately 99% of other similarly situated students scored higher than Smith in reading. Later test scores indicated that Smith was reading at about a second grade level at age eleven, and about a fourth grade level at age fourteen. When Smith was given the Wide Range Achievement Test at age fourteen, the results indicated that he was academically at an estimated 2.8 grade level – what would be expected of a child in the eighth month of his second grade year.

In 1975, when he was fourteen, Smith was given the Ammons Quick Test and made a raw score of 52, which corresponds to an I.Q. score of 70. The following year, Smith was again given the Ammons Quick Test, and this time he earned a raw score of 68, which corresponds to an I.Q. score of 84, according to the testimony of psychologist Dr. Daniel Grant, who subsequently examined and tested Smith and reviewed his medical records. Dr. Grant testified, however, that the result of an Ammons Quick Test does not accurately reflect a subject's true I.Q., for a number of reasons, including that the normal sample of the population for the test was small and not reflective of the general national population, that a subject has a 25% chance of getting a question right just by guessing, and that "it's only a measure of one thing and that's receptive vocabulary."

Smith was also tested in 1975 using the Wechsler Intelligence Scale for Children ("WISC"), a full-scale intelligence test. On the WISC, Smith scored a verbal I.Q. score of 79, a performance I.Q. score of 85, and a full-scale I.Q. score of 80. A number of the experts testified regarding the importance of using a recently standardized, culturally appropriate intelligence test that is properly administered by a person qualified to administer and score

-31-

the test, and that if these conditions are not met, the I.Q. score is likely inaccurate. Dr. Grant testified that the WISC was outdated and inappropriate in 1975, and that the updated and then-available revised WISC (the "WISC-R") should have been used. Dr. Grant further stated that because of the "Flynn effect," Smith's I.Q. scores should be downwardly adjusted by about 8.4 points. Dr. Grant explained that the Flynn effect describes the observed phenomenon that I.Q. test scores tend to increase over time, and therefore the most current version of an intelligence test should be used in order to obtain the most accurate result possible. When older versions of an intelligence test are used, the scores must be correspondingly adjusted downward. Dr. Grant further explained that the standard margin of error of measurement for the WISC in 1975 was approximately three points.

Smith turned to substance abuse at a fairly early age. In 1989, Dr. Pamela Auble, a clinical neuropsychologist, conducted a neuropsychological and personality evaluation of Smith and documented the following regarding his substance abuse history:

> Mr. Smith said that he began drinking at 12 or 13, though not heavily. He would also sniff gasoline with his friend [who] said that they would do this every day after school and all day during the summers. . . . The gasoline would cause hallucinations and make them feel like they were somewhere else or that they were something else (e.g., a lamppost). Leonard said that the effects would last about thirty minutes, and then they would do it again. Once, he passed out while sniffing gasoline and he was left with the jar near his nose. He said that he almost died from that experience. Severe substance abuse began when he was at reform school. He said that he has smoked marijuana at levels ranging from one cigarette every two days to a half ounce per day. Alcohol consumption has been at times up to two fifths per day. In addition, he has apparently abused amphetamines, seconal, valium, praludes, percodan, quaaludes, LSD, heroin and synthetic morphine. In the past, he has been addicted to heroin and synthetic morphine for which he said he was treated at DeBerry Correctional Institute. He has used cocaine occasionally.

Dr. Auble's report concluded:

> In summary, the neuropsychological data indicated borderline retarded functioning overall with particular deficits in attention, mental flexibility and fine motor speed. These results indicating dysfunction are most likely attributable to brain damage from any of a number of factors. His high fever and seizure when he was three, the multiple head injuries which he has suffered, and his long history of drug and alcohol abuse have probably all contributed to brain impairment. From the personality testing, there was

evidence of mild depression which is probably not sufficient to cause the observed impairment in concentration. This is a constricted man whose responses to situations will be simplistic and not always adaptive. An unexpected stressor might result in an overreaction which is impulsive and poorly considered. This would be even more true if he were intoxicated at the time of the stressor.

. . . .

Leonard's intellectual abilities are only in the borderline retarded range. He is even worse on tasks which require him to focus his attention or to adapt to new situations. He responds in simplistic ways to complex environments. His social judgment is poor. There is a tendency to over-react or under-react to stimuli. What this means for Mr. Smith in everyday life is that he cannot pay attention to events and adapt his behavior to changing situations.

Dr. Auble tested Smith using the revised Wechsler Adult Intelligence Scale ("WAIS-R") in 1989, yielding a verbal I.Q. score of 75, a performance I.Q. score of 85, and a full-scale score of 75. Dr. Grant testified that the Flynn effect would require a downward adjustment of two or three points, and that the standard error of measurement was approximately three points. Smith was later tested using the second revised WAIS, the WAIS-III, on two occasions. When Dr. Michael Tramontana tested him in 2001, Smith, who was then forty years old, made a verbal score of 78, a performance score of 85, and a full-scale I.Q. score of 77. When Dr. Grant tested him in 2002 using the same test, Smith made a verbal score of 66, a performance score of 69, and a full-scale I.Q. score of 65.

Dr. Grant in his testimony referred to a publication of the American Association on Mental Retardation entitled Mental Retardation: Definition, Classification, and Systems of Supports (10th ed.), which identified "various risk factors that have been shown through research that are often found to be related to an individual who's diagnosed as retarded." Dr. Grant testified that he found the following risk factors present in Smith's background:

[U]nder prenatal, under social: Poverty, maternal malnutrition, obviously during pregnancy, domestic violence, lack of access to prenatal care. Under behavioral: parental drug use, parental alcohol use. Under education: parental cognitive disability without supports. Questionably, maybe, lack of preparation for parenthood. And then under postnatal you have traumatic brain injury, malnutrition. Then under social you'd have impaired child care giver, lack of adequate stimulation, family poverty. Then under behavioral you'd have domestic violence, inadequate safety measures, social depravation,

difficult child behaviors, I would think child abuse or neglect. Then under educational, impaired parenting, delayed diagnosis, inadequate early intervention services, inadequate special education services, inadequate family support.

Dr. Grant concluded by testifying that in his professional opinion, Smith met the statutory criteria for being intellectually disabled when he committed the crime at issue.

Based upon the above-summarized evidence, the post-conviction court concluded that Smith had proven that he suffered from deficits in adaptive behavior, but that he did not prove that he had significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below that manifested by eighteen years of age. In its order dismissing Smith's post-conviction claim of intellectual disability, the court found as follows:

> The evidence presented shows that the petitioner suffered several head injuries as well as a significantly prolonged and escalated fever as a young child. He repeated second grade three times and ultimately quit attending school while in the fifth grade at the age of fifteen. The petitioner was raised by impoverished parents who were functionally illiterate. His parents provided little, if any, supervision or discipline at home and the petitioner eventually began committing crimes as a young adolescent. The petitioner received no intervention from either his family, the educational system or the juvenile justice system. The petitioner suffers from pervasive language and communication difficulties. He has difficulty forging personal relationships and reacts in impulsive and naive ways when confronted with stressful situations. He has difficulty with money concepts and is disadvantaged in his ability to follow rules. All of these deficits are supported by the petitioner's social history as well as by diagnostic evaluations performed by Dr. Grant. It is also clear that the petitioner has suffered these difficulties his entire life. Based upon all of this evidence, the court concludes that the petitioner has shown by a preponderance of the evidence that he suffered from deficits in adaptive behavior manifesting before the age of eighteen, sufficient to meet the criteria of Tenn. Code Ann. § 39-13-203(a)(2) &(3).

Regarding Smith's general intellectual functioning, the post-conviction court found "the recent evidence regarding the petitioner's functional IQ to be somewhat inconclusive. More significantly, testing performed before the age of eighteen reflects a functional IQ of 85." Smith's post-conviction counsel filed a motion to rehear, correctly pointing out that there was no evidence in the record to support a conclusion that Smith's test

results before he was eighteen reflected a functional I.Q. of 85. The motion to rehear also asserted that when the Flynn effect and standard margins of error were taken into consideration, the evidence supported a finding of significantly subaverage general intellectual functioning as evidenced by a functional I.Q. of 70 or less. The court denied the motion to rehear in an order stating, "The petitioner has simply failed to present any sufficient proof of an IQ below seventy manifesting itself before the age of eighteen. Additionally, the court notes, the arguments for margin of error are contrary to case law of this state and of no assistance to the petitioner. . . ."

In this appeal, Smith argues that based on the principles espoused and clarified in Coleman regarding "the question of the types of evidence that may be presented with regard to the criterion in Tenn. Code Ann. § 39–13–203(a)(1)," 341 S.W.3d at 241, his case should be remanded for a new hearing to determine whether he is intellectually disabled. We agree. In Coleman, as already noted, we conducted a thorough examination of "the process and criteria used by the courts to determine whether a criminal defendant charged with first degree murder should not be subject to the death penalty because he or she was a person with intellectual disability when the murder was committed." Id. at 230. We concluded that "[b]ecause the statute does not specify how a criminal defendant's functional I.Q. should be determined, . . . the trial courts may receive and consider any relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below." Id. at 241. The Coleman Court, recognizing "that, as a practical matter, a criminal defendant's 'functional intelligence quotient' cannot be ascertained based only on raw I.Q. test scores," id. at 247, further observed that

> Because intelligence tests are indirect rather than direct measures of intelligence, experts in the field recognize that they, like other measures of human functioning, are not "actuarial determination[s]," that these tests cannot measure intelligence with absolute precision and that these tests contain a potential for error. The current consensus is that the standard error of measurement in well-standardized intelligence tests is approximately three to five points.

Id. at 245 (brackets in original) (footnotes omitted). Discussing what kinds of evidence that may be presented and considered by a court to determine intellectual functioning and functional I.Q., we stated:

> In formulating an opinion regarding a criminal defendant's I.Q. at the time of the offense, experts may bring to bear and utilize reliable practices, methods, standards, and data that are relevant in their particular fields. . . .

. . .

> Accordingly, if the trial court determines that professionals who assess a person's I.Q. customarily consider a particular test's standard error of measurement, the Flynn Effect, the practice effect, or other factors affecting the accuracy, reliability, or fairness of the instrument or instruments used to assess or measure the defendant's I.Q., an expert should be permitted to base his or her assessment of the defendant's "functional intelligence quotient" on a consideration of those factors.

Id. at 242, 242 n.55. However, consistent with this Court's interpretation of Tennessee Code Annotated section 39-13-203(a)(1) in Howell v. State, 151 S.W.3d 450, 458 (Tenn. 2004), an expert's opinion regarding a criminal defendant's functional I.Q. cannot be expressed in a range but must be expressed specifically. Id.

Thus, the post-conviction court misapplied the applicable legal standard when it ruled that Smith's arguments regarding standard margin of error concerning intelligence tests were "contrary to the case law of this state and of no assistance" to Smith. Moreover, the Court of Criminal Appeals labored under a similar misconception that was not uncommon before our clarification of these issues in Coleman.

In Coleman, this Court concluded a remand was necessary to determine the question of whether the defendant met the statutory criteria for intellectual impairment under the correct legal standard, similarly to the Court's conclusion in the earlier Van Tran case. Coleman, 341 S.W.3d at 252-53, 237 (observing that in Van Tran, "the Court held that fundamental fairness required giving Mr. Van Tran an opportunity to litigate his claim that he was a person with intellectual disability"). We reach the same conclusion here. Upon remand, Smith and the State will be provided an opportunity to present evidence regarding Smith's functional I.Q. under the legal standard espoused in Coleman.

## VI.

The final issue we address is whether Smith's post-conviction claims in the Pierce case were barred by the statute of limitations and whether the statute should be equitably tolled. This Court affirmed Smith's conviction in the Pierce case on August 1, 1988. State v. Smith, 755 S.W.2d 757 (Tenn. 1988). It was not until May 2001 – almost twelve years after the conviction was final – that he collaterally attacked his convictions in the Pierce case by amending the petition in the Webb case to include those claims.

"Whether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness." Harris v. State, 301 S.W.3d 141, 145 (Tenn. 2010). At the time this Court affirmed Smith's conviction on direct appeal in the Pierce case on August 1, 1988, the law provided that "[r]elief under [the Post-Conviction Procedure Act] shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-105 (Supp. 1988). To obtain relief, however,

> a prisoner in custody under sentence of a court of this state must [have] petition[ed] for post-conviction relief under this chapter within three (3) years of the date of the final action of the highest state appellate court to which an appeal is taken or consideration of such petition shall be barred.

Tenn. Code Ann. § 40-30-102 (Supp. 1988). The statute did not provide for exceptions to the statute of limitations and did not contain any specific provision on tolling.

In 1992, in Burford v. State, 845 S.W.2d 204 (Tenn. 1992), we recognized a due process exception to the post-conviction statute of limitations. Mr. Burford was convicted in 1985 of armed robbery; his sentence was enhanced on the basis of five 1976 armed robbery convictions. Id. at 205. In 1988, four of the five 1976 convictions were held void. Id. Thereafter, in 1990, Mr. Burford filed a post-conviction petition in the 1985 case. Id. at 206. We acknowledged that under these circumstances, Mr. Burford was "caught in a procedural trap" that precluded him from timely filing a post-conviction petition. Id. at 208. Specifically, we recognized that "before a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner" and that, "under the circumstances of a particular case, application of the statute may not afford a reasonable opportunity to have the claimed issue heard and decided." Id. We held that under these circumstances, application of the post-conviction statute of limitations would deprive him of due process. Id. at 210.

In 1995, the Legislature revised the Post-Conviction Procedure Act. See Act of Apr. 26, 1995, ch. 207, 1995 Tenn. Pub. Acts 305 (effective May 10, 1995). Among other things, the new Act shortened the statute of limitations to one year. Tenn. Code Ann. § 40-30-202(a) (1996). The Act also expressly provided that each claim would be limited to a judgment or judgments entered in a single trial or proceeding; in this regard, the Act stated that "[i]f the petitioner desires to obtain relief from judgments entered in separate trials or proceedings, the petitioner must file separate petitions." Tenn. Code Ann. § 40-30-204(c) (1996). In

partial deference to the due process considerations espoused in <u>Burford</u>, the Act provided limited exceptions to the statute of limitations where:

> (1) The claim in the petition is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required. . . .
> (2) The claim in the petition is based upon new scientific evidence establishing that such petitioner is actually innocent of the offense or offenses for which the petitioner was convicted; or
> (3) The claim asserted in the petition seeks relief from a sentence that was enhanced because of a previous conviction and such conviction in the case in which the claim is asserted was not a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid . . . .

Tenn. Code Ann. § 40-30-202(b) (1996).

Two months after the effective date of the new Post-Conviction Procedure Act, we held in <u>Watkins v. State</u>, 903 S.W.2d 302 (Tenn. 1995), that in addition to the exceptions provided in Section 40-30-202(b), the general saving statute for incapacity, Tennessee Code Annotated section 28-1-106, would be applicable to post-conviction proceedings to toll the statute of limitations where a petitioner was mentally incompetent during the limitations period. <u>Id.</u> at 305. We further noted that even in the absence of a saving statute, application of the statute of limitations to a case where the petitioner was mentally incompetent would violate constitutional due process under the principles discussed in <u>Burford</u>. <u>Id.</u> at 305-06.

In 1996, the Legislature reacted to <u>Watkins</u> by amending the new Act to assert its intent to restrict the circumstances in which the statute of limitations would be tolled. The amendment provided:

> The statute of limitation shall not be tolled for any reason, including any tolling or saving provision otherwise available at law or equity. Time is of the essence of the right to file a petition for post-conviction relief or motion to reopen established by this chapter, and the one-year limitations period is an element of the right to file such an action and is a condition upon its exercise.

Tenn. Code Ann. § 40-30-202(a) (Supp.1996); Act of Apr. 25, 1996, ch. 995, 1996 Tenn. Pub. Acts 753 (effective May 13, 1996).

Since 1995, we have had the opportunity in a variety of contexts to address the question of when due process may require tolling of an applicable statute of limitations. <u>See</u>

-38-

Williams v. State, 44 S.W.3d 464 (Tenn. 2001) (recognizing a possible due process violation where counsel may have misled the petitioner into believing that appellate review was being sought by counsel when, in fact, it was not); State v. Nix, 40 S.W.3d 459 (Tenn. 2001) (clarifying when due process requires tolling of the post-conviction statute of limitations for mental incompetence); Seals v. State, 23 S.W.3d 272 (Tenn. 2000) (recognizing a possible due process violation where a petitioner is unable to file a post-conviction petition due to mental incompetence); Sands v. State, 903 S.W.2d 297 (Tenn. 1995) (adopting a three-step process to use in applying Burford).

The overarching concept from this line of cases is that

> [a] petitioner's interest in collaterally attacking a conviction is not a fundamental right that deserves heightened due process protection. However, before a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that a potential litigant be provided an opportunity for the "presentation of claims at a meaningful time and in a meaningful manner."

Seals, 23 S.W.3d at 277-78 (quoting Burford, 845 S.W.2d at 207).

Notably, even after the Legislature asserted its intent in 1996 to restrict the circumstances in which the statute of limitations could be tolled by adding the restrictive language of section 40-30-202(a), this Court affirmed the principles of Burford that due process considerations would nevertheless toll the statute if a petitioner did not have a "reasonable opportunity to assert a claim in a meaningful time and manner." Seals, 23 S.W.3d at 279 (reaffirming that despite the restrictive provisions of section 40-30-202(a), due process considerations required tolling of the statute of limitations during the time a petitioner was mentally incompetent to assert his post-conviction remedy).

In determining what sort of opportunity is "reasonable," we have determined that "'[i]dentification of the precise dictates of due process requires consideration of both the governmental interests involved and the private interests affected by the official action.'" Workman v. State, 41 S.W.3d 100, 102 (Tenn. 2001) (quoting Burford, 845 S.W.2d at 207) (addressing the tolling issue in the context of the statute of limitations on a petition for writ of error coram nobis); see also Sands, 903 S.W.2d at 301. We further observed in Seals that

> "Due process is flexible and calls for such procedural protections as the particular situation demands." Phillips v. State Bd. of Regents, 863 S.W.2d 45, 50 (Tenn. 1993) (citation omitted). The flexible nature of procedural due

process requires an imprecise definition because due process embodies the concept of fundamental fairness. State v. Barnett, 909 S.W.2d 423, 426 (Tenn. 1995); State v. Hale, 840 S.W.2d 307, 313 (Tenn. 1992). In determining what procedural protections a particular situation demands, three factors must be considered: (1) the private interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute safeguards; and finally, (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); Phillips, 863 S.W.2d at 50.

Seals, 23 S.W.3d at 277.

In determining whether application of the statute of limitations violates due process under the circumstances,

courts should utilize a three-step process: (1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

Sands, 903 S.W.2d at 301. "[T]he principles of due process are flexible and require balancing of a petitioner's liberty interests against the State's finality interests on a case-by-case basis." Sample v. State, 82 S.W.3d 267, 273-74 (Tenn. 2002) (citing Burford, 845 S.W.2d at 207).

In every case in which we have held the statute of limitations is tolled, the pervasive theme is that circumstances *beyond a petitioner's control* prevented the petitioner from filing a petition for post-conviction relief within the statute of limitations. In Williams, 44 S.W.3d at 468, we held that *misrepresentation* concerning the status of the direct appeal could constitute ineffective assistance of counsel. Short of active misrepresentation, however, we have never held that trial or appellate counsel's inadvertent or negligent failure to inform his or her client of the right to file a post-conviction petition constitutes ineffective assistance of counsel. See Sawyers v. State, No. M2007-02867-CCA-R3-PC, 2008 WL 5424031, at *4 (Tenn. Crim. App. Dec. 31, 2008), perm. app. denied (Tenn. Apr. 27, 2009). Williams is similar to Smith's case in that he seeks to toll the statute of limitations based on counsel's action or lack of action in the direct appeal. In Williams, the petitioner contended that the

statute of limitations should be tolled because after the Court of Criminal Appeals issued its decision, trial counsel failed to inform him that he had withdrawn from the case and failed to explain his right to file a pro se Tennessee Rule of Appellate Procedure 11 application for permission to appeal to this Court. 44 S.W.3d at 468. We remanded the case to the post-conviction court for an evidentiary hearing, stating that:

> [t]he question, then, is whether the appellee in this case was, in fact, misled to believe that counsel was continuing the appeals process, thereby requiring the tolling of the limitations period. . . . The sole inquiry here . . . is whether this limitations period is tolled because of due process concerns surrounding possible attorney *misrepresentation*.

Id. at 471 (emphasis added). We clarified that we were "not holding that a petitioner may be excused from filing an untimely post-conviction petition as a result of counsel's *negligence*" but that the inquiry was "only upon trial and appellate counsel's alleged *misrepresentation* in failing to properly withdraw from representation and in failing to notify the petitioner that no application for permission to appeal would be filed in this Court." Id. at 468 n.7 (emphasis added). In so holding, we recognized that "an attorney's misrepresentation, either attributable to deception or other misconduct, would . . . be beyond a defendant's control." Id. at 469. Negligence, as opposed to deception or misconduct, would not be sufficient to toll the statute. Cf. id. at 468-69.

Smith acknowledges that his conviction and sentence in the Pierce case were affirmed on August 1, 1988. See State v. Smith, 755 S.W.2d 757, 769 (Tenn. 1988) (on petition to rehear). The statute of limitations for filing a post-conviction petition was then three years; accordingly, Smith's time to file a petition expired on August 1, 1991. See Tenn. Code Ann. § 40–30–102 (Supp. 1988). Smith's petition was not filed until December 1999.[6] He concedes that none of his claims fall within any of the statutory exceptions of section 40-30-202(b)(1-3) (1996), to toll the statute of limitations (i.e., a new constitutional right that did not exist at trial, new scientific evidence, or seeking relief from a sentence that was enhanced because of a previous conviction that was later held to be invalid). The issues he raises in

---

[6] This December 1999 date gives Smith the benefit of the doubt, since no challenge to the conviction and sentence in the Pierce case was made until an amended petition was filed in May 2001. For purposes of this opinion, we will assume that the amended petition relates back to the filing date of the original petition. See Tenn. Code Ann. §§ 40-30-204(a) (1996) (stating that "a post-conviction proceeding is commenced by filing . . . a written petition . . . .") & -206(d) & (e) (contemplating the filing of an amended petition). See also Tenn. Sup. Ct. R. 28, §§ 6(c) (outlining counsel's obligation to file an amended petition), & 8(D)(5) (granting the post-conviction court discretion to allow free amendment of post-conviction petitions).

the Pierce case all relate to ineffective assistance of counsel at trial, grounds that clearly existed at the conclusion of his direct appeal.

Smith contends, however, that because the Pierce and Webb cases originally were tried together, and because the same two attorneys who represented him in the Pierce case continued to represent him in the Webb case, which was not actually resolved until May 17, 1999, the statute of limitations in the Pierce case should be tolled until the time the Webb case was resolved. Unlike the circumstances in Williams, Smith does not claim any willful misrepresentation on the part of his trial or appellate counsel. He simply reasons that trial counsel had an obligation to inform him of the need to file a separate post-conviction petition in the Pierce case. He asserts that counsel did not do so because they were in a dilemma due to their continued representation in the Webb case, and any petition alleging ineffective assistance of counsel would have created a conflict of interest for them.

At the post-conviction hearing in the Webb case, trial counsel Boatright testified that he and co-counsel Weddington never discussed filing a post-conviction petition in the Pierce case. He further stated that, had he been asked about it at the time, he would have opined that a post-conviction petition in that case had no chance of success on the merits. He conceded, however, that as the trial and appellate counsel in the Pierce case, neither he nor Weddington were in the best position to evaluate their own performance or Smith's potential success in a bid for post-conviction relief from that conviction.

We perceive the crux of this matter to be whether, at the conclusion of his appeal in the Pierce murder case, Smith was afforded a "reasonable opportunity to have the claimed issue[s] heard and determined." Burford, 845 S.W.2d at 208. There is no evidence, and Smith does not argue, that he was unaware that the appeal in the Pierce case was final, or that he was misled regarding the time to file a post-conviction petition. In fact, we take judicial notice of the fact that in the years following the trial and appeals in the Pierce case, Smith has filed several post-conviction petitions in other unrelated cases, evincing an awareness of the right and the procedures to file such a petition. See Leonard E. Smith v. State, No. 03C01-9110-CR-336, 1992 WL 85787 (Tenn. Crim. App. Apr. 29, 1992); Leonard Edward Smith v. State, Carter County No. 89, 1990 WL 59393 (Tenn. Crim. App. May 10, 1990).

Regarding his claim that he could not file a post-conviction petition in the Pierce case so long as trial counsel continued to represent him in the Webb case, the principles of due process simply do not compel such a result. We agree that trial counsel in the Pierce/Webb cases could not have represented Smith in a post-conviction action attacking either of those convictions. See Frazier v. State, 303 S.W.3d 674, 682 (Tenn. 2010) (noting that "an attorney in a post-conviction proceeding who has represented the same petitioner on direct appeal has a clear conflict of interest."). This fact does not mean that Smith could not have

filed his own post-conviction petition, either *pro se* or with new counsel. It also does not mean that filing a post-conviction petition in the Pierce case while the Webb case was ongoing would necessarily have created a conflict of interest. Had Smith filed a timely petition in the Pierce case, while this *might* have resulted in a conflict of interest for counsel in the ongoing Webb case depending on what issues were raised, such a conflict could have been addressed by the trial court either by appointing different counsel for the Webb case, by informing Smith of the conflict and inquiring of him whether he wished to execute a knowing waiver of any conflict, or by taking some other appropriate remedial action.

Smith's reliance on Frazier is misplaced. In Frazier, the defendant was convicted on a single charge of second-degree murder. 303 S.W.3d at 677. After the Court of Criminal Appeals affirmed Frazier's conviction and sentence, his appointed trial counsel failed to either withdraw pursuant to Rule 14 of the Rules of the Supreme Court of Tennessee, or to file an application for permission to appeal to this Court pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure. Id. at 677-78. Some thirty-one months after the Court of Criminal Appeals' opinion was filed, Mr. Frazier retained a new attorney, Gerald L. Gulley, Jr., who filed a petition for post-conviction relief on his behalf. Id. at 677. The petition alleged that appointed counsel was ineffective for, among other things, failing to file the application for permission to appeal. Id. at 678. Although the petition was clearly untimely, the State conceded that the petitioner had a right to second-tier review, and the trial court granted a delayed appeal, holding the remaining post-conviction claims in abeyance. Id. Thereafter, Mr. Gulley filed the delayed application with this Court. Id. After we denied the application, Mr. Gulley continued to represent Mr. Frazier on the remaining post-conviction matters in the trial court. Id. When Mr. Frazier lost his post-conviction claims in the trial court, Mr. Gulley appealed the case to the Court of Criminal Appeals. Id. After losing in that court, Mr. Frazier filed a pro se Application for Permission to Appeal in this Court, alleging for the first time that since Mr. Gulley had represented him in the delayed appeal, he should have been disqualified in the subsequent post-conviction proceeding and appeal. Id. We granted the application and held that counsel for a criminal defendant at trial and on direct appeal may not later represent the same defendant in post-conviction proceedings relating to the same conviction unless the petitioner knowingly waived the conflict of interest. Frazier, 303 S.W.3d at 682-83.

Frazier is distinguishable from this case in several important respects. First, there was a single conviction in that case. Second, there was an actual, not potential, conflict, when appellate counsel on direct appeal also acted as counsel in the post-conviction proceedings. In this case there is no actual conflict of interest. Finally, Frazier did not involve the application of due process tolling under Burford, Seals, and Williams. The untimeliness of Mr. Frazier's post-conviction petition was never an issue because the State conceded that Mr. Frazier was entitled to a delayed appeal and the trial court granted that

relief. Under those unique facts, we remanded the case back to the trial court for an inquiry into whether Mr. Frazier waived the conflict of interest. We elected not to affirm the judgment of the Court of Criminal Appeals on the alternative basis that the underlying petition was untimely.

To rule as Smith asks would be to effectively toll the statute of limitations in *any* case in which multiple charges were tried together and part of them were remanded for further action. The provision in the post-conviction statute requiring that petitioners file separate petitions to obtain relief from judgments entered in separate proceedings has been interpreted by the Court of Criminal Appeals to mean that a judgment of conviction and sentence affirmed on direct appeal is final for purposes of seeking post-conviction relief even when there are unresolved, remanded charges arising from the same charging instrument. See Roland R. Smith v. State, No. M2007-01420-CCA-R3-PC, 2008 WL 4735479, at *2 (Tenn. Crim. App. Oct. 27, 2008), perm. app. denied (Tenn. Mar. 16, 2009); Stephen Willard Greene v. State, No. E2005-02769-CCA-R3-PC, 2007 WL 1215022, at *4 (Tenn. Crim. App. Apr. 27, 2007). We agree with that analysis.

Smith's primary focus on seeking relief in the Webb case was understandable, since he was sentenced to death in that case. There is no evidence that Smith was misled by any deception or misconduct on the part of trial counsel to forgo his right to post-conviction relief in the Pierce case. When Smith's conviction in the Pierce case became final on August 1, 1988, nothing prevented him from filing a petition seeking post-conviction relief. Even assuming that his amended claim filed on May 10, 2001, which raised the issues in the Pierce case for the first time, relates back to the time the original post-conviction claim in the Webb case was filed on December 17, 1999, this is still more than eleven years after the Pierce case conviction became final, and more than eight years after the statute of limitations expired. We hold that the petition for post-conviction relief in the Pierce case is barred by the statute of limitations.

## Conclusion

Smith's conviction and sentence for the Pierce murder is affirmed. Smith's conviction for the Webb murder is affirmed. Smith's death sentence is vacated, and the case is remanded to the trial court for hearings on the question of whether Smith was intellectually disabled at the time of the Webb murder and for resentencing. These hearings are to be conducted by a judge other than Judge Brown. It appearing from the record that the Petitioner is indigent, costs on appeal are assessed to the State of Tennessee.

_____
SHARON G. LEE, JUSTICE