IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 14, 2020 Session

## STATE OF TENNESSEE v. EDWARD WALSH

**Appeal from the Criminal Court for Clay County**
**No. 2015-CR-51     Gary McKenzie, Judge**

_____

### No. M2019-00989-CCA-R3-CD

_____

In October of 2015, Defendant, Edward Walsh, was indicted by the Clay County Grand Jury for first degree murder, abuse of a corpse, tampering with evidence, and theft of property. The theft of property charge was severed, and the tampering with evidence charge was nolled before trial. After a jury trial, Defendant was found guilty of first degree murder and abuse of a corpse. The trial court sentenced Defendant to life imprisonment for the murder conviction and a concurrent two-year sentence for the abuse of a corpse conviction. On appeal, Defendant argues that the trial court erred in not severing the offenses of first degree murder and abuse of a corpse, that the trial court erred in admitting hearsay, that the trial court was not impartial, that the State's closing argument was based on inferences from facts not in evidence, and that evidence was insufficient to prove first degree murder. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT L. HOLLOWAY, JR., JJ., joined.

Craig P. Fickling, District Public Defender and Benjamin D. Marsee, Assistant Public Defender (at trial), M. Todd Ridley, Assistant Public Defender (on appeal), for the appellant, Edward Walsh.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Mark E. Gore, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Facts and Procedural History*

### *I. Pre-Trial Severance Motion*

Defendant filed a pre-trial motion to sever the offenses of first degree murder and abuse of a corpse. In Defendant's motion, Defendant argued that the offenses were "wholly separate and unrelated to each other." Defendant further argued that the offenses were not part of a common scheme or plan and that evidence "relating to the offenses would not be admissible upon trial of the other offenses." Finally, Defendant argued that if the offenses remained joined, he would be unduly prejudiced and that severance is necessary in "order to promote a fair determination of [Defendant's] guilt or innocence on each offense." In support of his severance argument, Defendant argued that joinder was permissive rather than mandatory. Defendant conceded that joinder of the abuse of corpse count and the tampering of evidence count were subject to mandatory joinder but that the theft count and first degree murder count should be severed. The State conceded that the theft count should be severed but argued the remaining counts should not be severed. The State argued that the counts were subject to mandatory joinder.

On January 9, 2017, a hearing was held on Defendant's motion to sever. The State presented the testimony of the medical examiner, Dr. David Zimmerman, Tennessee Bureau of Investigation ("TBI") Special Agent Steve Huntley, and District Attorney Investigator Randal Slayton.

Dr. Zimmerman testified that he received the victim's body in "multiple fragments" that were in various states of decomposition. He observed that the head had been cut from the torso, and opined that the marks on the bones were consistent with cuts made by a saw and could not have been made by a knife. Much of the skin and fat had been removed from the victim's back and buttocks. The left arm was missing, and the remaining limbs were detached from the victim's torso. Flesh had been removed from several limbs. The victim's internal organs were in a state of decomposition because they were found buried in the ground. The victim's brain was "extremely decomposed." The remaining limbs were better preserved because they were found in Defendant's freezer.

There was no blood in the victim's body, so the victim's liver was analyzed, and it showed that the victim had several drugs in her system including gabapentin and three different opioids. Dr. Zimmerman indicated that it was impossible to tell if the victim's death was an overdose because the intoxicant levels found in the liver would be much higher than the levels found in the blood. Based on the condition of the victim's body and the circumstances under which it was found, Dr. Zimmerman concluded that the

cause of death was "homicidal violence." This is a term used when he "can't definitively tell a cause and manner of death." Dr. Zimmerman indicated that the dismemberment could have caused the death or been inflicted after death. Given the state of the victim's remains, Dr. Zimmerman could not state the cause of death for certain, but he determined that the severing of the head and limbs were a possible cause of death. Dr. Zimmerman saw no evidence of manual strangulation such as ligature marks or a fracture to the hyoid bone, but the absence of such injuries did not rule out death by strangulation.

Dr. Zimmerman could not give a specific time and date of death. He stated, however, the condition of the victim's remains were consistent with the theory that the victim had been killed sometime on July 7, 2015. Dr. Zimmerman saw no evidence of natural disease that would have caused the victim's death. Although Dr. Zimmerman could not determine the exact cause of death, the dismemberment was an important factor in concluding that she died from "homicidal violence."

Investigator Slayton learned of a missing person's case from Clay County Sheriff Brandon Boone. The victim had been reported missing by her sister, Sonya Scott, on August 7, 2015. Investigator Slayton called Agent Huntley to advise him of the case. Investigator Slayton and Agent Huntley first spoke to Defendant on August 11, 2015. They learned that Defendant had been in a romantic relationship with the victim for about sixteen months. Defendant denied knowledge of the victim's wherabouts and indicated that she left with her belongings after an argument on July 7, 2015. Defendant gave consent to a search of his residence.

Later on August 11, Investigator Slayton learned that what appeared to be a body was found buried on the property behind Defendant's home. Investigator Slayton and Agent Huntley both observed a shallow grave and what appeared to be a body emitting a "strong odor or decomposition." A forensics team was called to excavate the remains. During the search, the victim's head was found at another burial site in a trash bag along with "what appeared to be skin." The victim's limbs were found in trash bags in Defendant' freezer. There was blood splattering on the wall in Defendant's bathroom and around the faucet of the bathtub.

After the discovery of the torso, Investigator Slayton again interviewed Defendant, outside his home. Defendant stated that he and the victim argued for several days about her drug use and money. During the argument, Defendant pushed the victim onto the bed four or five times. The victim followed Defendant out of the bedroom and retrieved a knife from the kitchen. Defendant "disarmed her, spun her around, put her in a choke hold, using the bend of his arm at his elbow." "[Defendant] explained it as, [Defendant] squeezed [the victim around the neck] and lifted [her] up." The victim passed out. Defendant took the victim to the bedroom and laid her on the bed. After leaving the

victim in the room on the bed for about an hour "to cool off," Defendant went to check on the victim and "realized that she had passed away." Defendant indicated that he started digging a grave around 2:30 a.m. He did not finish digging that night because the work was "really hard on him." Defendant denied that he dismembered the victim's body.

Defendant was interviewed a third time after investigators learned the extent of the victim's dismemberment. Defendant admitted that he cut off the victim's arms, legs, and head. Defendant contradicted his earlier statement and said he returned to check on the victim only a couple of minutes after choking her and found her dead. After sitting on the bed for several minutes, Defendant decided that he would "have to do something with the body." Defendant cried for a while and decided a couple of hours later to bury the victim and started digging the grave. Given Defendant's physical disabilities, he indicated that it was hard work and he made little progress. He returned to his house around daylight and then went to work. When he returned home, he resumed digging around 9:00 p.m. and finished around 4:00 a.m. Later that morning, Defendant determined that the victim was too heavy for him to carry her to the grave, so he "decided that he would cut her up." Defendant dragged the victim into the bathroom and put her in the tub. Defendant then left to go to work and returned later that afternoon and started to dismember the victim's body. Based on Defendant's statement, Investigator Slayton determined that Defendant began to dismember the victim within forty-eight hours of her death.

The trial court found that mandatory joinder applied. The trial court found that the events of murder and abuse of corpse occurred during the same criminal episode. The trial court noted that the idea to "get rid of the body" was formed immediately or a short time after Defendant realized the victim was dead. The trial court found it was in close sequence and in a closely situated area and that the proof of one offense involved the proof of the other. The trial court stated that "the jury needs to hear all of this proof to make a determination." Defendant's motion for severance was denied by the trial court as being permissively joined as well.

## II. Trial

A jury trial was held August 15–18, 2017. Ms. Scott testified that she had last seen the victim on November 17, 2014, when Ms. Scott was jailed for a probation violation. The victim regularly put money on Ms. Scott's jail account so Ms. Scott could call the victim from jail. Ms. Scott stated that the victim and Defendant had been in a romantic relationship for about two years. Ms. Scott explained that the victim received a monthly social security disability check and that Defendant was the "representative payee" who handled the victim's checking account.

Ms. Scott had a parole hearing on July 7, 2015 and became concerned when the victim and Defendant did not show up to the hearing. Later that month, Ms. Scott learned that money had been put into her account, so she called to talk to her sister. Defendant told Ms. Scott that her sister "had been missing for over a month." Defendant explained to Ms. Scott that he and the victim had argued and she left while he was sleeping. Defendant told Ms. Scott that he would report the victim as missing to the police. Ms. Scott called back a few days later and became more concerned after hearing that Defendant had not contacted the police.

In early August, Ms. Scott made several phone calls to the Clay County Sheriff's Office and reported her sister missing to Sheriff Boone. Sheriff Boone opened an investigation on August 7, 2015. On August 8, 2015, Deputy Jason Sells and Deputy Tyler Thompson spoke to Defendant about the missing person report. Defendant told the deputies that the victim had been missing since July 8. Defendant had not reported her missing because he "just figured she'd show up sometime." Defendant told the deputies that the victim left after an ongoing argument about money. Defendant told them he had made some inquiries with some of her friends to try to find her. Defendant explained that the victim had an appointment with an attorney in Nashville to collect on a settlement. Defendant claimed that he called the attorney and asked him to call if she showed up. Defendant admitted to the deputies that he had received the victim's disability check and used it to pay off some of her "bad checks."

Several days after the sheriff's office first contacted Defendant, Sheriff Boone went to Defendant's house. Defendant agreed to let Sheriff Boone look around his house. Defendant accompanied the sheriff and made conversation explaining that he was remodeling. Defendant also pointed out clothing that the victim left behind.

While Sheriff Boone was in the house, Chief Deputy Jeffery Allen and Deputy Josh Brawner looked around the property outside Defendant's home. Deputy Brawner discovered a patch of ground that seemed out of place. It appeared "that something had been buried there." Chief Deputy Allen retrieved a shovel from his car and started to dig. Chief Deputy Allen recalled a very distinct odor. He went inside Defendant's house and asked Defendant if he knew what was buried behind Defendant's house, and Defendant replied that he did not.

Digging resumed and about eighteen inches down, the deputies felt a "mass." Chief Deputy Allen notified Sheriff Boone. Sheriff Boone also smelled a "very strong odor of body decomposition." Enough of the mass was uncovered to determine that it was a human torso buried in the ground. Sheriff Boone then requested the assistance

from the TBI. The site was secured that day and processing continued with help from the TBI.

The following morning Sheriff Boone noticed another area on the property that "looked abnormal." Another shallow grave was discovered that contained plastic trash bags with the victim's head and flesh inside. The TBI forensics team exhumed the victim's remains under the direction of Dr. Hugh Berryman. The victim's limbs were found in trash bags inside Defendant's freezer.

Dr. Zimmerman performed the autopsy on the victim and determined that the victim's head had been severed by using some type of saw. Dr. Zimmerman provided testimony substantially similar to the testimony that he provided during the pre-trial hearing. Dr. Zimmerman stated that the cause of death was "homicidal violence." Dr. Zimmerman noted that injuries to the neck were not always observed in strangulation deaths. He agreed that a "carotid sleeper hold" could cause unconsciousness within seconds and could lead to death if not released. Dr. Zimmerman agreed that drug intoxication could decrease the time required for the sleeper hold to cause death.

Herman Goolsby, Defendant's closest neighbor, testified that he liked to sit on his porch during the warmer weather months. At some time while Mr. Goolsby was on his porch, he heard who he assumed to be the victim and Defendant arguing. Mr. Goolsby stated that he heard Defendant tell the victim to "shut her mouth." Mr. Goolsby heard the victim beg Defendant not to hurt her and saying "Honey, Ed, honey, don't hurt me. I love you." Mr. Goolsby then heard something fall. After this day, Mr. Goolsby never saw the victim again. During Mr. Goolsby's testimony, Defendant objected to hearsay, and the State argued that it was admissible as an excited utterance. The trial court allowed testimony to proceed but eventually sustained Defendant's objection because a proper foundation had not been laid. The State asked for a jury-out hearing to present an offer of proof. Mr. Goolsby left the witness stand and the State proceeded with their next witness. The trial court noted that it was "difficult to understand [Mr. Goolsby], given his health conditions and things of that nature." The court allowed the State to recall Mr. Goolsby and stated that "you're going to have to control him and slow down." The State responded that given "the dialect that [Mr. Goolsby] uses, we're getting what we're going to get out of him." Defendant again objected on relevance and hearsay grounds based mostly on the witness not recalling when he heard the argument between Defendant and the victim. Mr. Goolsby then testified that he heard the argument in the summer of 2015, which narrowed the time frame to the relevant time. The trial court then had the following exchange with Mr. Goolsby:

> Trial Court: Let me ask you a quick question. When you heard the female's voice, did she sound – how did she sound? Did she sound calm or

– how did she, when you heard the female's voice, how would you describe, how would she sound?

Mr. Goolsby: She was begging not – him not to hurt her.

Trial Court: Okay. Did she sound upset or calm?

Mr. Goolsby: Yeah, yeah, she sounded upset. Yeah.

The trial court stated that the testimony "helped the [c]ourt a lot to understand what just took place." The trial court ruled that the State could recall Mr. Goolsby, and Defendant restated his objections to hearsay and relevance.

Kent McCoy, a friend of Defendant's, knew the victim as Defendant's girlfriend. Mr. McCoy stopped by Defendant's house sometime during July and asked where the victim was. Defendant responded that he "killed the bitch." Defendant followed up by saying "[n]o, I'm just kidding, . . . she took my truck and my money and left." Mr. McCoy replied that the victim would be back to which Defendant replied, "[n]o she won't be back."

On August 11, 2015, Defendant agreed to go to the sheriff's office and speak with Investigator Slayton and Agent Hunley. Defendant's statement was recorded and played for the jury. Defendant told the investigators that on July 7 he and the victim had been arguing for days over money and drugs. Defendant stated that he had "had enough" and went to take a nap. When Defendant awoke, the victim was gone. Defendant explained that it was not unusual for the victim to "disappear for a while." He stated that he began looking for her the following day. Defendant recounted that the victim caused him a great deal of financial stress. In early July, Defendant loaned the victim $200 because she was upset that her disability check was late. Although Defendant was the "representative payee" on the victim's disability check, he did not know what happened to the proceeds of the July check. He stated that he cashed her August check and used the funds to pay off some of the victim's debts. Defendant took the $200 that the victim owed him and also added funds to Ms. Scott's jail account.

Defendant claimed that the victim was supposed to receive a large settlement from a lawsuit against a doctor and that he was promised some of the proceeds. Defendant, however, doubted whether she had told him the truth about the settlement. Defendant claimed that he tried to help the victim financially and to help keep her off drugs. Due to his efforts to help the victim, he lost his house.

Defendant stated that the victim hit him often but that he never hit her back. Defendant stated that he would only grab her by the shoulders or arms to make her stop hitting him. Defendant denied hurting the victim after their last argument. He denied knowing what happened to the victim and insisted that he would have told investigators if he had accidentally killed her. At the end of the interview, Defendant consented to a search of his house and surrounding property. Sheriff's deputies drove Defendant back to his house where a search was conducted.

When the victim's torso was found in a shallow grave during the search, Investigator Slayton again interviewed Defendant. The second interview was also recorded and played for the jury at trial. Defendant claimed that he "ha[d] no idea" what was in the grave. He stated that he had not been in that area of his property. After Investigator Slayton asked Defendant what happened, Defendant admitted that he and the victim had been fighting and arguing for several days. The victim began hitting Defendant, and he walked away at first. Defendant then "just grabbed her by the shoulders" and shoved her onto the bed. The victim got up and Defendant "pushed her on the bed a couple of times." After he pushed her, Defendant claimed he could not remember anything else. After a short break, Defendant recalled that after he pushed her down, he walked through the house, and the victim slammed the bedroom door. Defendant then stated "[h]ow the f . . k could I do that and not ever want to hurt her?" Defendant then claimed he did not remember how the victim died.

Defendant stated the last time he pushed the victim on to the bed, he "got on top of her" and held her down. Defendant told the victim to leave and to stop bothering him. Defendant walked out of the room and told the victim he was "not doing this anymore." The victim slammed the bedroom door and told Defendant that he would not receive any of her settlement money. Defendant went to the front room of his house, laid down on the floor, and went to sleep.

After continued questioning by Investigator Slayton, Defendant said that the victim came out of the bedroom and obtained a knife from the kitchen. The victim told Defendant that "she was going to f. . . ing cut [his] head off." Defendant disarmed the victim when she came after him with the knife. Defendant then "put her up . . . in a headlock-type situation and thought she had passed out." Defendant dragged the victim back to the bedroom and put her on the mattress. About an hour or two later, Defendant went to wake the victim up. When Defendant realized the victim was dead, he "freaked out." Defendant was "scared" and "sat there and cried." Defendant believed it was about 10:00 or 11:00 p.m. when he discovered the victim was dead. Defendant stated that he left the victim in the bedroom during the two days it took him to dig the grave. Defendant denied dismembering the victim and stated that he wrapped her body in a quilt. Defendant admitted that he placed the victim in the grave.

The day after the shallow grave was found, Investigator Slayton interviewed Defendant a third time. The third interview was recorded and played for the jury at trial. Investigator Slayton informed Defendant that human body parts had been found in Defendant's freezer. Defendant then agreed with Investigator Slayton's suggestion that Defendant dismembered the victim because she was too heavy to move. Defendant became reluctant to discuss further details.

Defendant admitted that after finding the victim dead that he "was just scared to death." Defendant had ruled out calling 9-1-1 because of previous domestic disputes and "being the one . . . persecuted." Defendant thought that officers would not believe his story that the victim's death was an accident and that he would go to jail. Defendant decided that calling the police was not an option. Defendant agreed that the only other option he considered was to hide the victim's body.

Defendant then described how he used a large kitchen knife to cut the victim up "like [he] would a deer." After cutting the victim up, he "took a bath in that bathtub and scrubbed everything clean." Defendant claimed that he put the victim's head and torso in the same grave. Defendant planned to scatter the body parts that were in the freezer in different places. He had already taken one of the victim's legs to the dump in his trash.

Defendant had taken the victim to a doctor's appointment on July 7. He stated that the victim was agitated because the doctor did not write her a prescription. Defendant and the victim got in to an escalated argument at home when Defendant refused to give the victim money to buy pills. The victim began hitting Defendant when he claimed that he did not love her and had "just put up with [the victim's s. . .t] for all this [f . . .ing] time for no reason." Defendant told the victim that he had "had enough" and pushed her down on the bed four or five times. Defendant then straddled the victim and told her that "this was not going to happen no more." Defendant then left the bedroom, and the victim slammed the door. A short time later, the victim emerged from the bedroom and got a knife from the kitchen. She came at Defendant yelling that she was going to "kill [him]." Defendant grabbed the victim by the wrist and disarmed her. He pushed the victim back into the bedroom. The victim threatened to call the police and to have "all these people" come after Defendant.

Defendant told Investigator Slayton the "last straw" came when the victim obtained another knife. Defendant again disarmed the victim. He then "spun[the victim] around [and] locked her into [his] arm" in a choke hold. He applied the hold for about fifteen seconds until she stopped "flailing and stuff." When she went "limp," he "tossed her on the bed." Defendant walked away to calm down for "probably a couple of minutes." Defendant then went to check on her and found her dead. Defendant stated

that if he got "rid of her body, there ain't – there ain't no [f . . . ing] problem, you know?" Defendant made the decision to dispose of the victim's body within a couple of hours of the victim's death.

Over the next two nights after the killing, Defendant dug a hole. After completing the hole, Defendant realized that the victim was too heavy and decided to dismember her. He dragged the victim's body in to the bathtub. Defendant got a large knife, removed the victim's limbs, and let her "bleed out" in the tub. Defendant then removed the victim's head and cut off "three or four inches" of skin and fat "to make it light and manageable." He put some of the skin and fat in a trash bag, and drove to a remote road. He threw the flesh into an area where he knew that coyotes and "wolf hybrids" were located. Defendant then returned home and cleaned the bathroom.

Photographs of the victim's remains, the graves, Defendant's house and property, the bathroom and bathtub with blood splatters, and Defendant's freezer with the black trash bags were all entered in to evidence and shown to the jury.

Defendant waived his right to testify and offered no additional proof.

The jury found Defendant guilty of first degree murder and abuse of a corpse. Defendant timely filed a motion for new trial, and the trial court denied the motion. It is from that denial that Defendant now appeals.

### *Analysis*

On appeal, Defendant argues that the trial court erred when in denied Defendant's motion to sever the offenses, that the trial court improperly inserted itself into the proceedings when it permitted the State to recall Herman Goolsby, that the trial court erred when it found that Mr. Goolsby's testimony was admissible as an excited utterance, that the State erred in its closing argument by making unsupported inferences and making improper references to facts not in evidence, and that the evidence is insufficient to sustain a conviction of first degree murder. The State argues that the offenses were properly joined, that the trial court did not err in its rulings concerning Mr. Goolsby, that the State's closing argument was proper because it was based on reasonable inferences from facts in evidence, and that evidence was sufficient to sustain a conviction of first degree murder.

### I. Motion to Sever Offenses

Defendant argues that the trial court erred when it denied Defendant's motion to sever the offenses and that the error irrevocably prejudiced Defendant. Specifically,

Defendant argues that the trial court first erred by concluding that the offenses of first degree murder and abuse of a corpse were subject to mandatory joinder. Defendant further argues that even under permissive joinder, "the offenses could not be tried together because evidence of one offense would not have been admissible in a trial on the other offense." The State argues that the offenses are "inextricably linked and subject to mandatory joinder." The State contends that the offenses were also subject to permissive joinder. We agree with the State.

Joinder of offenses may either be mandatory or permissive. *See* Tenn. R. Crim. P. 8(a), (b). "Two or more offenses must be joined or consolidated if (1) the offenses arise from the same conduct or criminal episode; (2) the conduct is known to the appropriate prosecuting official at the time of the return of the indictment; and (3) the offenses fall within the jurisdiction of a single court." *State v. Baird*, 88 S.W.3d 617, 620 (Tenn. Crim. App. 2001) (citing Tenn. R. Crim. P. 8(a)). Offenses are part of the "same conduct" when "a single act . . . results in a number of interrelated offenses." *State v. Johnson*, 342 S.W.3d 468, 473 (Tenn. 2011). Offenses are part of the "same criminal episode" when they "occur simultaneously or in close sequence," "occur in the same place or in closely situated places," and "proof of one offense necessarily involves proof of the others." *Id.* at 475 (internal quotations and citations omitted). The Advisory Commission Comments to Tennessee Rule of Criminal Procedure 8 provide:

> This rule is designed to encourage the disposition in a single trial of multiple offenses arising from the same conduct and from the same criminal episode, and should therefore promote efficiency and economy. Where such joinder of offenses might give rise to an injustice, Rule 14(b)(2) allows the trial court to relax the rule.

Rule 14 allows a trial court to sever mandatorily joined offenses before trial if appropriate to promote a fair determination of the defendant's guilt or innocence. *See* Tenn. R. Crim. P. 14(b)(2)(A). The trial court's refusal to grant a severance under Tennessee Rule of Criminal Procedure 14(b)(2) will not be reversed unless the defendant was prejudiced by the decision to try the charges together. *State v. Wiseman*, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982).

In reviewing a claim under the mandatory provision of Tennessee Rule of Criminal Procedure 8(a), this Court is bound by the trial court's factual findings unless the evidence preponderates against them. *State v. Baird*, 88 S.W.3d 617, 620 (Tenn. Crim. App. 2001). The trial court's application of the law to the facts is reviewed de novo, with no presumption of correctness. *Id.* A trial court's decision concerning permissive joinder is reviewed on appeal for an abuse of discretion. *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). A trial court's denial of a motion to sever offenses will

be reversed on appeal only when the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id*. (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)); *see also State v. Goodwin*, 143 S.W.3d 771, 780 (Tenn. 2004).

After reviewing the evidence presented at the severance hearing, the trial court concluded that the two offenses arose from the same criminal episode. *See State v. Johnson*, 242 S.W.3d 468, 474-75 (Tenn. 2011). The trial court found that Defendant made the decision to "get rid of the body . . . within a very short time" after killing the victim. The trial court found that Defendant's idea to dispose of the victim's body and the execution of his plan was "in close sequence" to the killing, and that it occurred in the same place as the killing. The trial court further found that the proof of the killing was inextricably linked to the proof of the abuse of a corpse offense. Based on its findings, the trial court found that mandatory joinder applied and severance was not appropriate.

The proof does not preponderate against the findings of the trial court. Defendant killed the victim. Based on his own statement, Defendant decided within a short period of time that his only option was to dispose of the body. He killed the victim, left her lying in a bed for two days, and then dismembered her; each event happened under the same roof. He left the body to decompose in a bed for two days while digging a grave. The fact that his physical limitations made the labor difficult and took two days, does not negate the fact that the intent was formed "in close sequence" to the killing. Defendant's recorded statement to Investigator Slayton regarding his decision to not call 9-1-1, leaving him only with the option to dispose of the body is "inextricably connected" to the victim's murder and abuse of her corpse. As we have found that mandatory joinder was appropriate, it is not necessary to decide whether permissive joinder applies.

Given that mandatory joinder is appropriate, nothing in the record shows that Defendant suffered prejudice from the joinder of the offenses. Defendant argues that the two offenses cannot be separated in the minds of jurors. However, the trial court instructed the jury that it must consider each count as a separate and distinct offense, and it must decide each charge separately on the evidence and the applicable law. Jurors are presumed to follow the trial court's instructions. *State v. Parker*, 350 S.W.3d 883, 897 (Tenn. 2011).

Defendant also contends that by trying the offenses together the photographs of the victim's dismembered body would be presented and would only serve to inflame the jury. However, even if the offenses were severed, the photographs of the victim's remains would be relevant and admissible at separate trials. Defendant has not shown he suffered prejudice. Defendant is not entitled to relief.

## II. Violation of Right to Fair Trial

Defendant argues that the trial court improperly inserted itself into the proceedings when it re-raised the issue of Mr. Goolsby's testimony and assisted in "coaxing relevant testimony out of the witness." In so doing, Defendant claims the trial court violated his right to a fair trial. The State argues that Defendant's claim that the trial court unfairly intervened has been waived. Specifically, the State argues that Defendant only objected on the grounds of relevancy and hearsay during the trial and that Defendant did not include the violation of Defendant's right to a fair trial in his motion for new trial. We agree the issue has been waived by Defendant.

Our supreme court has stated that parties are entitled to an impartial judge. *State v. Smith*, 357 S.W.3d 322, 339 (Tenn. 2011). "[I]f the public is to maintain confidence in the judiciary, it is required that cases be tried by unprejudiced and unbiased judges." *Id*. (internal citations omitted). A contemporaneous objection is required when a party objects to the trial court's actions outside the presence of a jury. *See* Tenn. R. Evid. 614(c).

Here, the trial court brought up the testimony of Mr. Goolsby on its own. The trial court was clear in its reasoning that it was trying to understand what Mr. Goolsby was saying. The State had also requested to present an offer of proof. While we do not have a recording of the proceedings, the transcript is clear that Mr. Goolsby's manner of speaking was difficult to understand. Outside the presence of the jury, Mr. Goolsby was further questioned by the State and by the trial court, and the trial court reversed its earlier ruling and allowed Mr. Goolsby's testimony to be presented to the jury. Defendant objected on the grounds of relevancy and hearsay. Defendant did not object to the trial court's questioning of Mr. Goolsby, nor did it raise an objection as to the trial court's "coaching" on the excited utterance exception. As well, Defendant did not include the violation of his right to a fair trial claim in his motion for new trial. As it is being presented for the first time on appeal, the issue is waived. *See* Tenn. R. App. P 3(e).

Tennessee Rule of Appellate Procedure 36(b) allows this Court to take notice of plain errors that were not raised in the trial court. *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). Issues not raised at trial may be reviewed in the discretion of the appellate court for plain error when these five factors are established: (a) the record clearly establishes what occurred in the trial court; (b) a clear and unequivocal rule of law was breached; (c) a substantial right of the accused was adversely affected; (d) the defendant did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice. *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016). In this case, Defendant admittedly raised the issues for the first time on appeal, thereby waiving

plenary review. Consequently, we will look to see if the trial court's failure to merge the convictions constitutes plain error. Defendant has not established that a clear and unequivocal rule of law was breached. Defendant is not entitled to relief.

### III. Excited Utterance

Defendant argues that the trial court erred when it found that Mr. Goolsby's testimony was admissible under the excited utterance exception to the hearsay rule. Specifically, Defendant argues that Mr. Goolsby was unable to articulate "any meaningful details about the alleged statement," and he was "unable to satisfy even the most basic elements of the excited utterance exception." The State argues that Mr. Goolsby's testimony was properly admitted. We agree with the State.

"Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

"Hearsay" is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible except as allowed by the rules of evidence or other applicable law. Tenn. R. Evid. 802. When a trial court makes factual findings and credibility determinations in the course of ruling on whether an item of evidence is hearsay, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. *State v. Gilley*, 297 S.W.3d at 759-61. The questions of whether a statement is hearsay or fits under one of the exceptions to the hearsay rule are questions of law and subject to de novo review by this Court. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). One exception to the prohibition against hearsay evidence is for excited utterances. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition." Tenn. R. Evid. 803(2). "Underlying the excited utterance exception is the theory that 'circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication.'" *State v. Franklin*, 308 S.W.3d 799, 823 (quoting *State v. Land*, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000)).

While Mr. Goolsby could not identify the exact date, he identified the time frame as during the summer months because he sat outside during the warmer weather. Mr. Goolsby also identified Defendant and the victim as his closest neighbors and confirmed that he was able to hear them from his house. Mr. Goolsby heard an argument coming from his neighbor's house. Mr. Goolsby testified that a female voice was "begging" and that she was upset. The female called out "Ed, don't hurt me." In our view, such a statement, as described under these circumstances, can reasonably be interpreted as a statement related to a condition made while the declarant was under stress or excitement. We conclude that the testimony fits within the excited utterance exception to the hearsay rule. Therefore, the trial court did not abuse its discretion in admitting the statement during the testimony of Mr. Goolsby. Defendant is not entitled to relief.

## IV. Closing Argument

Defendant claims that the State "engaged in unsupported speculation during its closing arguments about facts not found it evidence." The State argues that Defendant has waived this issue because Defendant did not object during the State's closing. *See State v. Jordan*, 325 S.W.3d 1, 57-58 (Tenn. 2010). We agree with the State that the argument has been waived.

"Appellate review generally is limited to issues that a party properly preserves for review by raising the issues in the trial court and on appeal." *State v. Minor*, 546 S.W.3d 59, 65 (Tenn. 2018). However, Tennessee Rule of Appellate Procedure 36(b) allows this Court to take notice of plain errors that were not raised in the trial court. *Smith*, 24 S.W.3d at 282. Initially, Defendant points to no unequivocal rule of law that has been breached. Defendant is not entitled to plain error relief because he has not established all five factors necessary for plain error review. *See State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). Defendant is not entitled to plain error review.

## V. Sufficiency of Evidence

Defendant argues that the State failed to establish that Defendant acted with premeditation. The State asserts that the evidence was sufficient to prove all the elements of first degree murder.

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914

(Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). We may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Here, Defendant was charged with first degree murder. In relevant part, first degree murder is "[a] premeditated and intentional killing of another." T.C.A. §39-13202(a)(1). Tennessee Code Annotated §39-13-202(d) defines premeditation as:

An act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The State must establish the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). The existence of premeditation is a question of fact for the jury and may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Such circumstances include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, threats or declarations of an intent to kill, a lack of provocation by the victim, failure to aid or assist the victim, the procurement of a weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. *State v. Kiser*, 284 S.W.3d 227,

268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013).

Defendant contends that the only evidence the State presented that substantiates premeditation is the dismemberment and concealment of the victim's body. Defendant relies on *State v. Jackson* in that "concealment of evidence of a crime, standing alone, is insufficient to prove premeditation." 173 S.W.3d 401, 409 (Tenn. 2005). While this is true, the jury heard evidence that Defendant was calm and collected throughout the month that the victim was missing. He told the victim's sister that he had every reason to believe the victim was still alive. He took two days to dig a hole to put the victim in and then realized she was too heavy, so he methodically dismembered her like a "deer." He cut pieces of the victim's flesh off and threw them out for wild dogs to devour. Defendant paid the victim's debts to minimize inquiries into her whereabouts. Defendant told a friend that he had killed her and that she "won't be back." Defendant admitted that the victim had ruined him financially and that he had "had enough." Defendant also admitted to placing the victim in a choke hold and holding for about fifteen seconds until she stopped "flailing and stuff." The evidence is more than sufficient to support the jury's decision. Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE